NEWS PUBLISHING CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 8078. Promulgated May 6, 1927.

1. Where a corporation secures an amendment to its charter by means of which its authorized capital stock is increased, issues this stock for stock of a like par value of a corporation which held its stock, liquidates the latter corporation, and cancels its own stock which the latter held, there is not thereby anything paid in to the corporation.

2. Under the foregoing conditions, stock of another corporation not affiliated, which was taken over by the corporation should be valued at the cash value at date of liquidation.

3. Amounts paid to build up circulation structure and amounts expended in the acquisition and manufacture of lithographing plates which are used from year to year, both of which amounts were originally charged to expense, may not be restored to invested capital, unless definite information as to the expenditures is shown.

4. Affiliation denied in the absence of evidence as to the control exercised by the company claiming affiliation.

5. Under section 234 of the Revenue Act of 1918, there is no provision for the partial writing down of an account prior to the time when the debt is ascertained to be worthless, or for charging off a partial loss on account of an investment in a corporation prior to the time the actual loss is determined.

*Harvey D. Jacob, Esq.,* and *Walter A. Bolinger, Esq.,* for the petitioner.
*P. J. Rose, Esq.,* for the respondent.

This proceeding is for the redetermination of deficiencies of $11,114.62 and $8,072.29 for the calendar years 1918 and 1919, respectively.

The errors assigned by the petitioner are: (1) The failure of the Commissioner to allow certain proved tangible and intangible assets as invested capital; (2) the failure of the Commissioner to permit petitioner to file consolidated returns for itself and its subsidiary, the Washington News Co., of Washington, Pa.; (3) the failure of the Commissioner to allow as a deduction for bad debts in the years on appeal advances made to the Washington Daily News of Washington, Pa. (This error is contended for only if the second error is not found.)

FINDINGS OF FACT.

The petitioner is a West Virginia corporation which was organized in 1890 with a capital stock of $14,000, and is engaged primarily in the publication of a daily afternoon and Sunday morning

paper. This capitalization was increased from time to time by stock dividends and one sale of stock to employees for $5,000 cash so that its outstanding capital stock was $75,000 on January 16, 1904, when its total capital stock was acquired by the newly formed Wheeling Printing & Paper Co. (hereinafter sometimes referred to as the Holding Company) in exchange for $310,000 capital stock of the latter company.

Another corporation which it is necessary to consider in connection with this appeal is the Intelligencer Publishing Co., (hereinafter referred to as the Intelligencer) a business begun prior to the Civil War and continued, either under individual or partnership form of organization, until 1893 when it was incorporated with a capital stock of $100,000, and had such an outstanding capital stock when 89 per cent of its capital stock was acquired by the Wheeling Printing & Paper Co. in 1904. Its business was that of publishing a daily morning paper.

In the negotiations leading up to the consolidation of the petitioner and the Intelligencer, considerable discussion took place as to the basis on which the consolidation would be effected. Finally, it was decided that the Holding Company would be formed with a capital stock of $400,000, $310,000 of which would be issued for the stock of the petitioner and $90,000 for the stock of the Intelligencer. On January 15, 1904, the day before the consolidation was to have become effective and after announcement to that effect had been made, a fire occurred in the plant of the petitioner resulting in a loss of approximately $75,000. The majority stockholder of the Intelligencer thereupon objected to the old basis of its entering the consolidation, but the agreement was ultimately effected as decided upon except that one stockholder of the Intelligencer, owning approximately $11,000 capital stock, refused to enter the consolidation. The Holding Company held as its only assets $75,000 capital stock of the petitioner and $89,000 capital stock of the Intelligencer.

The three corporations continued in existence until 1914, when, for reasons of economy in state taxation, the petitioner secured an amendment to its charter by which its authorized capital stock was increased from $75,000 to $400,000, and new stock issued to the old stockholders of the petitioner in exchange for the stock of the Holding Company of like par value. The Holding Company was thereupon dissolved and its assets, consisting of $89,000 par value of the stock of the Intelligencer and $75,000 par value of stock of the petitioner, were taken over by the petitioner, the old stock of the petitioner being canceled.

The petitioner and the Intelligencer were ruled nonaffiliated for the years on appeal.

No exact evidence was given as to petitioner's earnings from date of incorporation, though the business was successful. Dividends were paid for the greater part of the period from 1892 to 1904 at the rate of 6 per cent on the capitalization. The stock was closely held, no sales being made at or prior to 1904, except one sale of $5,000 to employees, three or four years prior to this date. In addition to the payment of dividends, earnings were left in the business to the extent that its net worth on January 1, 1904 (including that represented by outstanding capital stock), was approximately $170,000. On account of a fire loss in 1904, no dividends were paid in 1904 and 1905, but dividend payments were resumed in 1906, in which year and in the following year dividends were paid on the outstanding capital stock of the Holding Company at the rate of 2 per cent. Subsequently, with the exception of one year, up to and including 1913, dividends were paid at the rate of 6 per cent on the capital stock of the Holding Company.

Subsequent to the 1914 merger, the petitioner paid dividends at the rate of 6 per cent upon its total capitalization. In addition thereto, it paid one preferred-stock dividend of 50 per cent and one preferred-stock dividend of 20 per cent and has paid 7 per cent on these issues of stock.

The net worth of the petitioner as shown by its books of account on January 1, 1904, was approximately $170,000. Due to a fire on January 15, 1904, which caused a loss of approximately $75,000, the net worth on January 16, 1904, the date of the consolidation, was substantially less than that on January 1, 1904. The next statement of its net worth was on December 31, 1905, when it was $149,321.10. At the end of subsequent years it was as follows:

| Year. | Net worth. | Increase. |
|---|---|---|
| 1906 | $175,250.28 | $25,929.18 |
| 1907 | 203,789.52 | 28,539.24 |
| 1908 | 229,437.38 | 25,647.86 |
| 1909 | 230,550.26 | 1,112.88 |
| 1910 | 253,321.82 | 22,771.56 |
| 1911 | 267,472.77 | 14,150.95 |
| 1912 | 285,729.92 | 18,257.15 |
| 1913 | 310,805.72 | 25,075.83 |
| 1914 | Not given. | ---------- |
| 1915 | 337,673.00 | 26,867.28 |
| 1916 | 341,065.62 | 3,392.62 |

Various sums were spent by petitioner in building up circulation structure from 1892 to 1904 by means of popularity contests and other schemes common to the newspaper business, which amounts were charged to expenses. These expenditures from 1899 to 1916 were $76,139.20 for salaries and expenses of solicitors who were engaged solely in securing new business for the petitioner. Prior to 1904 various amounts had been expended in the acquisition and pro-

duction of plates, many of which were used beyond the year in which acquired or manufactured in the lithographing and engraving business which was run as a branch of the newspaper. These expenditures were not capitalized, but charged to expense when made. Some of these plates had become obsolete by 1904.

The Intelligencer paid dividends on its capital stock from 1893 to 1898. In 1899 the majority of its stock was sold. From 1899 to 1904, the operation of the business was not so successful though it did prove a fair competitor in publishing the Wheeling Intelligencer, a morning paper, to the petitioner which published the Wheeling News, an afternoon and Sunday morning paper. Subsequent to 1904 no dividends were ever paid by the Intelligencer, though its net worth increased $78,309.08 from December 31, 1905, to January 1, 1914.

In computing the invested capital of the petitioner for 1918 and 1919, the Commissioner allowed as invested capital the capital stock and surplus as reflected by its books at the time of the reorganization in 1904 plus such earnings as had accrued since that date, thus disallowing the difference between the par value of the Holding Company's stock which was issued for petitioner's stock in 1904 and the net book value of petitioner's assets at that date. The Commissioner allowed no value for circulation structure or for plates, expenditures for both of which had been charged to expense.

The pertinent facts as far as necessary to a consideration of errors (2) and (3) alleged are as follows:

In 1913 or 1914, certain wealthy citizens of Washington, Pa., interested the petitioner in organizing the Washington News Co. (hereinafter referred to as the News), for the purpose of publishing a regular Republican newspaper in that town, the two papers published having joined the so-called Progressive Party, headed by the late Theodore Roosevelt. It was agreed that the corporation would be capitalized at $25,000, that the citizens would contribute $15,000 and the petitioner would contribute $10,000. The amount pledged by the petitioner was paid and stock issued therefor, but only approximately $11,000 was paid in by the citizens.

The corporation began the publication of the News on April 1, 1914, and continued until 1920, when operations were suspended and the affairs of the corporation wound up. The entire management of the corporation was carried on by the petitioner, and no further contributions were made, or assistance given, by the citizens for the operation or management of the News. Print paper was furnished by the petitioner and advances were made to cover a part of the cost of operations, which advances on December 31, 1916, amounted to $16,349.97. Advances were made by the petitioner until the News ceased operations.

In 1917, the petitioner decided that its investment in the News, including not only its original investment, but also advances subsequently made, which it carried as an asset, was of doubtful value since the liabilities of the News far exceeded its assets, and began charging it off as a matter of good accounting practice. The amount charged off during 1918 was $8,685.61 and during 1919 was $16,-120.72. Both amounts were disallowed by the Commissioner as deductions from gross income for 1918 and 1919, though they were allowed upon final liquidation of the News.

The Commissioner held that the petitioner and the News were not affiliated for the years on appeal.

The only meeting of the stockholders was that held at the time of organization in 1914. The suspending of the operations and winding up of the affairs of the News in 1920 was handled entirely by the petitioner without any notice to Washington (Pennsylvania) stockholders.

## OPINION.

LITTLETON: The first error alleged by the petitioner is that the Commissioner erred in failing to allow certain proven tangible and intangible assets as a part of invested capital, and in support thereof sets up these contentions:

(a) The petitioner is entitled to include in its invested capital for the taxable years in question the actual cash value of the tangible property (the tangible property being the total capital stock of the original issue of the News Publishing Co. and 89% of the capital stock of the Intelligencer Publishing Co.) acquired by the Wheeling Printing & Paper Co. in exchange for stock at the time of the latter's incorporation in 1904.

(b) If the first point should be denied, then it must follow that the News Publishing Co. resulting from the reorganization in 1914 was in effect an entirely new entity and that therefore the petitioner is entitled to include in its invested capital for the taxable years in question the actual cash value of the tangible property acquired by it for the new stock at the time of the 1914 reorganization.

(c) Such amounts as had been expended in the building up of a circulation structure and in the acquisition and manufacture of plates should be considered as capital expenditures and the amounts thereof considered in determining invested capital.

In connection with this point the petitioner asks that it be allowed to include as a part of its invested capital the surplus earned from 1904 (if this date is taken as a starting point), or from 1914 (if the latter date is taken as the starting point) to the taxable years under consideration, but it is not felt that this point is in serious contro-

versy as it is understood that in the invested capital as determined by the Commissioner, earned surplus as reflected by the petitioner's books has been allowed.

Since the Wheeling Printing & Paper Co. was dissolved in 1914, it is not necessary for us to determine what might have been the invested capital of this consolidated group (Wheeling Printing & Paper Co. and the petitioner) had both of them remained in existence during the taxable years on appeal. Suffice it to say that they do not occupy such a status, and no assets were paid in to the petitioner in 1904. Therefore, the contentions advanced under subdivision (a) above will not be considered further.

This brings us to the alternative proposition advanced by the petitioner, viz., that in 1914, when the petitioner, by amendment to its charter, increased its capital stock from $75,000 to $400,000, issued new stock for the stock of the Wheeling Printing & Paper Co. of a like par value and then dissolved the latter company, circumstances arose which would justify a revaluation of assets as of this date for invested capital purposes under the provisions of the Revenue Act of 1918.

The Wheeling Printing & Paper Co. held as its only assets in 1914 the $75,000 capital stock of the petitioner and $89,000 capital stock of the Intelligencer Publishing Co. By amendment to its charter, petitioner increased its capital stock to $400,000 and exchanged new stock for stock of a like par value of the Holding Company and then dissolved the Holding Company, thereby acquiring whatever assets the Holding Company had. It will thus be seen that the assets acquired were the capital stock of the Intelligencer and its own old stock when new stock had already been issued under the amendment to its charter to take the place of the old stock.

The record is not sufficiently complete to determine all the legal incidents arising from the securing of the amendment to the charter of the petitioner, but accepting the evidence as offered we find that merely an amendment to an existing charter was secured. What, in general, the amendment to a charter means is stated in 14 Corpus Juris 197, where numerous cases are cited in support of this proposition:

The mere amendment of a charter or articles of incorporation does not create a new corporation or otherwise affect the identity of the corporation, or its existing rights of action, property rights, or liabilities; and this is true even where the amendment is made by the substitution of a new charter, if the manifest intention is to amend merely and not to create a new corporation.

That it was not the intention to create a new corporation is shown by the fact that the amendment was secured merely for economy in state taxation, to avoid paying tax on the capital stock of two corporations instead of one.

Therefore we are dealing with the same corporation which was organized in 1890, as far as its legal entity is concerned. Our question now is whether anything was paid in in 1914, at the time of the merger, in the sense contemplated by section 326, Revenue Act of 1918, for invested capital purposes.

When the petitioner issued its own stock for the stock of the Wheeling Printing & Paper Co. and then effected a liquidation of the latter company, it acquired the assets of the Wheeling Printing & Paper Co. by the payment of stock therefor. *Appeal of Regal Shoe Co.*, 1 B. T. A. 896. But what were these assets? The entire capital stock of the petitioner and $89,000 capital stock of the Intelligencer Publishing Co. As to the capital stock of the petitioner which was thus acquired, it can not be said that anything came into the corporation which was not already there. That the assets of a corporation are owned by the corporation and not by the stockholders is too well established to admit of questioning. The petitioner owned its assets before the merger and it likewise owned them afterwards. The only new asset which can be said to have been paid in at this time was the stock of the Intelligencer, and as to this the petitioner is entitled to have the cash value when paid in, viz., in 1914, under the provisions of section 326, Revenue Act of 1918.

The next question presented is the value of this stock, but no satisfactory evidence has been presented as a basis of determining its value. No sales were made, either of this stock or that of the Wheeling Printing & Paper Co., at or about the date in question. The same is true of the stock of the petitioner. When we examine the earnings of the Intelligencer prior to 1914, we find that they amounted to a total of $78,309.08 in the eight years immediately preceding 1914, and that no dividends were paid during that period. What the net or gross value of its assets was during this period is not shown. The Commissioner allowed this stock in invested capital at its par value and this is as liberal as the Board can be on the basis of the evidence presented.

As a further contention with respect to invested capital, petitioner claims that the amounts which were expended in building up circulation structure and in the acquisition and manufacture of plates which were used in the business beyond the year when acquired or manufactured, should be considered as capital expenditures, even though originally charged to expense.

That circulation structure is perhaps the most important asset of a news publishing business was recognized by the Board in the *Appeal of Gardner Printing Co.*, 4 B. T. A. 37, and, therefore, if its cost can be determined it must be considered in determining petitioner's invested capital. Our difficulty lies in determining its cost.

The only definite statement we have is that there was expended from 1899 to 1916, $76,139.20 as salaries and expenses of solicitors engaged in building up and maintaining circulation structure. We are of the opinion that this is not sufficient. See *Public Opinion Publishing Co.*, 6 B. T. A. 1255. We said in the *Gardner Printing Co.* appeal, *supra*:

A newspaper circulation structure is an asset which must be continually supported by such advertising and soliciting as will result in constantly bringing in new subscribers and new advertising patrons to take the place of those who, in the regular course of business, are constantly dropping off.

Any addition to invested capital on this account must, therefore, be denied.

The evidence is likewise insufficient to make a restoration to the capital account because of expenditures made in the acquisition and manufacture of plates. That the expenditure for an item which has a useful life of more than a year should generally be treated as a capital expenditure was recognized by the Board in the *Appeal of Winifrede Coal Co.*, 1 B. T. A. 566; *Appeal of Union Collieries Co.*, 3 B. T. A. 540; *Appeal of Goodell-Pratt Co.*, 3 B. T. A. 30. But again we are without definite information as to the amount expended, when expended and the extent to which these plates are still in use and therefore no amounts which the petitioner may have invested in this way can be considered in determining its invested capital.

Petitioner claims that it should be affiliated with the Washington News Co. for the years on appeal under the provisions of section 240 (b), Revenue Act of 1918, which reads as follows:

For the purpose of this section two or more domestic corporations shall be deemed to be affiliated (1) if one corporation owns directly or controls through closely affiliated interests or by a nominee or nominees substantially all the stock of the other or others, or (2) if substantially all the stock of two or more corporations is owned or controlled by the same interests.

It is under clause one above that the petitioner claims affiliation on the ground that entire control of the News was vested in it.

The record does not disclose the exact amount of stock issued, though it does show that of the authorized capital stock of $25,000, $10,000 capital stock was issued to the petitioner and that approximately $11,000 cash was paid in by citizens of Washington, Pennsylvania, but it was not definitely shown that stock was issued for the latter amount. The only contributor (of the citizens) who testified stated that $1,000 capital stock was issued for his contribution of a like amount. The probabilities are, therefore, that the entire $11,000 was issued for capital stock.

That the entire operation and management of the News were left to the petitioner the record is clear, but the Board is not convinced that there was such "control" as is contemplated by the statute.

As was stated in the *Appeal of Isse Koch & Co.*, 1 B. T. A. 624, "control" means actual control. In the same opinion it is stated further that, "The control, however, must be shown to be a genuine and real control actually exercised, and it can not be established by mere assertions or agreements between majority and minority stockholders unsupported by facts."

That the stockholders (other than the petitioner) did not at any time after the News began operation exercise any control in the sense contemplated by the statute is certainly shown, but that they did not have power through the voting rights of their stock to exercise control is not shown. We are of the opinion that something more must be shown than a mere failure to exercise control which potentially, at least, existed.

In the *Appeal of Watsontown Brick Co.*, 3 B. T. A. 85, we said:

Control of the business is not control of the stock of a corporation conducting a business, nor, where a minority of stockholders are present, even though quiescent, representing 27.04 per cent of the stock, can we hold that the stock owned or controlled by the parent company constitutes substantially all of such stock.

We denied affiliation in the *Appeal of Goldstein Bros. Amusement Co.*, 3 B. T. A. 408, for the reason that control over the minority stock was speculative and because ownership and control of 75 per cent of stock by same interests is insufficient to establish affiliation where there is no evidence of actual control of minority stock and it is merely shown that minority interests were quiescent and permitted majority to manage corporation.

The Board must, therefore, hold that the two corporations were not affiliated for the years on appeal.

Since it has been found that the petitioner and the News were not affiliated, it becomes necessary to consider the third error alleged in which the petitioner seeks to have allowed as deductions the amounts which it charged off in the years on appeal on account of advances to, and investment in, the News. The News continued in operation throughout the years on appeal, and, while the business was not profitable for those years, the petitioner continued to make advances to carry on its operation. The extent to which the amount charged off in each year represented amounts charged off on account of advances and the extent to which on account of the original investment are not shown.

When the News was still in operation, and no definite ascertainment of the extent of the loss which may have been sustained had been made, certainly there is no justification for saying that a loss on account of investment in its stock has been realized which can be recognized under the Revenue Act of 1918. The investment in the stock gave the petitioner its proportionate right to a participation

in the assets upon liquidation, and what the value of this right would be, would not be determined until liquidation.

As to the deduction claimed on account of a partial charge-off of the advances, there is no provision under the Revenue Act of 1918 for the partial writing down of an account. *Steele Cotton Mill Co.*, 1 B. T. A. 299.

We must hold, therefore, that the action of the Commissioner was correct in disallowing the deductions claimed on account of losses due to investment in, and advances to, the Washington News Co. .

The deficiencies as determined by the Commissioner are, therefore, approved.

*Judgment will be entered for the respondent.*