RASSIEUR et ux. v. COMMISSIONER
OF INTERNAL REVENUE.

No. 12193.

Circuit Court of Appeals, Eighth Circuit.

July 3, 1942.

Abraham Lowenhaupt, of St. Louis, Mo. (George M. Rassieur, Lowenhaupt, Waite & Stolar, and Rassieur & Rassieur, all of St. Louis, Mo., on the brief), for petitioners.

Harry Marselli, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., on the brief), for respondent.

Before STONE, SANBORN, and THOMAS, Circuit Judges.

STONE, Circuit Judge.

This is a petition by Theodore Rassieur and his wife (Carrie M. Rassieur) to review an order of the Board of Tax Appeals denying deductions for a stock loss and for bad debts in their tax year 1933. It is undisputed that the loss occurred and that the debts became bad. The only question is whether these happened in 1933 so as to be proper deductions in that year. The Board sustained the Commissioner in his determination that the loss and bad debts became worthless prior to 1933 and taxpayer seeks review.

Taxpayer (Theodore Rassieur) [1] joined with his son (T. Edward Rassieur) and

John P. Sweeney in organizing Rassieur, Sweeney & Co., Inc. He subscribed $50,000 himself and advanced each of them $100,000 to pay for their separate stock subscriptions. Each of these advances was upon a note expressly prohibiting personal liability of the maker but secured by deposit of the stock as collateral. The loss here was through the $50,000 of stock in that company becoming worthless. The bad debts arose from the stock, deposited as collateral to the notes, becoming worthless. For some time before 1933, the company debts exceeded its assets and it would have been unable to sustain itself except for advances made to it by taxpayer for the purpose of keeping it going. Early in 1933, taxpayer determined he could no longer make such advances and, in June, 1933, the corporation was dissolved—at which time its debts exceeded its assets. The Board thought that the time the debts became worthless should be determined as the time the stock became worthless, because there was no personal liability of the makers (the collaterally deposited stock being the only source of payment); because taxpayer was intimately familiar with the affairs of the company; and because he, "as a prudent business man", would have ascertained the stock to be worthless before 1933. It determined the stock to be worthless prior to 1933 because of the business and financial conditions of the company prior to that year.

I. Stock Loss.

There is no dispute as to the evidentiary facts. The question here is whether the evidentiary facts constitute substantial evidence to support the ultimate fact, found by the Board, that this stock became worthless prior to taxpayer's tax year of 1933, which began January 1, 1933. This is a question of fact. Helvering v. Ames, this Court, 71 F.2d 939, 943. The evidence consisted of the testimony of Theodore Rassieur and various exhibits showing the financial condition of the company at different times from its beginning to dissolution. The essential evidentiary facts thus shown are as follows.

Taxpayer Theodore Rassieur was a practicing attorney with outside business interests and investments. His son, T. E. Rassieur, was a young man having several

[1] For convenience, Theodore Rassieur will be referred to as the taxpayer since Mrs. Rassieur had no connection with these dealings and is here solely because she and her husband filed this joint tax return.

years experience in the brokerage business at St. Louis. John P. Sweeney had considerable experience in the brokerage business at St. Louis, having been in charge of the bond department of a large trust company and, in 1929, was sales manager of a brokerage business. In 1929, taxpayer was induced by his son to put him and Sweeney into business for themselves. The result was organization of Rassieur, Sweeney & Co., Inc., with paid in capital of $250,000, of which taxpayer subscribed $50,000 and each of the others $100,000. Taxpayer advanced the funds to each of the others and took their separate notes (expressly prohibiting personal liability of the makers) therefor secured by pledges of their stock. In May, 1929, the company went into the general brokerage business at St. Louis with an organization of fifteen men made up of an experienced staff of office men, salesmen, stock exchange men, and traders. It had memberships in the St. Louis Stock Exchange and in the Investment Bankers Association. The company also bought and sold securities on its own account. In conducting its margin business, it made advancements for some customers.

After being in business six months, at the end of October, 1929, there was a profit of $71,417.87 on operations, without consideration of increase in value of securities then owned. At that time, the company had $223,976 in customers' accounts receivable, $416,495 of its own investments in stocks and bonds, and owed banks and brokerage houses $406,908.

The panic came the last of October, 1929. That the panic had a drastic and, for several years, a continued depressive effect upon business generally is a matter of such universal knowledge that we may take notice thereof. As to brokerage businesses, two of its reactions were upon the market values of stocks and bonds and upon the volume of dealings therein. The market value of all securities declined and the volume of trading fell off. As shown by this record, general conditions were progressively more unfavorable from the beginning of the panic through 1932 and, as

taxpayer testified, "the outlook wasn't any too good in January, 1933." As mirrored in market prices of bonds of the International Telephone & Telegraph Corporation,[2] the recovery began some time in 1933 and progressively grew to 1938. As other like businesses, this company felt these ill effects. The results were reflected both in the character and volume of business and in the financial condition of the company.

*As to character and volume of business.* An early change occurred in September, 1931. August 31, 1931, there was $109,700 due from customers, the market value of securities owned had materially declined, and $327,000 was due banks—only $783 to others. Taxpayer concluded the customer accounts should be collected and applied on debts and no further loans to customers for margin trading should be made, as he was apprehensive that he would be unable to help "if I let them go on owing that much money". In September, 1931, customer receivables were collected and reduced from $109,428 to $74,505, some investments (stocks and bonds) were sold and the bank indebtedness reduced from $327,000 to $228,750. By the end of 1931, those receivables had been reduced to $54,705, representing six accounts. With slight variations, this continued until November, 1932, when there were only three accounts (totalling something over $36,000) which were eventually charged off. By March, 1932, the business of the company "had materially dropped," the man who was a trader of unlisted stocks and the one who appeared daily on the Exchange floor were let out.

Late in 1930, T. E. Rassieur had developed a theory of determining the course or trend which the stock market would take. He worked on this during 1931 and finished it early in 1932. This took the form of a booklet—"Trend Interpretation by T. Edward Rassieur." May 26, 1932, the company made a royalty contract, with T. E. Rassieur, to market it by sale to subscribers at a price of $100 per month and authorized the printing of the booklet at its expense. Sales were difficult at $100 and the price was reduced to $25 commencing November,

---

[2] The annual range of these bonds from 1929 to 1938, inclusive, was as follows:

|  | "High | Low |
| --- | --- | --- |
| 1929 | 224 | 109½ |
| 1930 | 129¾ | 77¼ |
| 1931 | 96 | 31 |
| 1932 | 59 | 17¼ |
| 1933 | 67 | 20⅛ |
| 1934 | 73½ | 56 |
| 1935 | 88¾ | 58½ |
| 1936 | 99⅞ | 77⅞ |
| 1937 | 94¼ | 74 |
| 1938 | 100¾ | 74." |

1932. This service was carried on until January 7, 1933, when the contract was cancelled.

The situation from June, 1932, is concisely stated by the taxpayer as follows:

"During this time, although it was the desire to decrease expenses as much as possible, it was necessary to maintain an office, to have solicitors, telephones and stenographers. The service was carried on in that way from June 1932 until January 7, 1933, when the contract [with T. E. Rassieur] was cancelled. That was the business that was then being carried on by the Company from June 1932 with the idea and hope that it would make a profit. The Company also rendered other service during that period. It had as late as December 31, 1932, $168,000.00 par value of International Telephone & Telegraph Company bonds and $9,000.00 par value of Valspar Corporation bonds, besides stocks of the market value at that time of $3,941.59. It had to maintain some organization for the purpose of determining what should be done with these assets and when. It also had collateral up on outstanding accounts at that time aggregating $35,000.00 or $36,000.00, and it had to watch the market to determine when collateral should be sold. So there were those three functions that the Company performed, commencing with say June 1932, down to June 24, 1933. It had ceased to do a regular brokerage business, but it was now a holding company, owning these securities, and it had to exercise judgment as to when these securities ought to be sold and when, if ever, we should go back into the brokerage business, after this April. During the year 1932 it had to look after these securities. It sold some of these securities. Others it held. It held the securities because it was the Company's judgment and my judgment that the market had not yet come back sufficiently to justify the sale. We (the Company) sold out collateral during that period and we operated this stock market trend interpretation service. Those were the three functions that the Company was carrying on during the year 1932.

"When I received the December 31, 1932, statement, which was within a couple of days after that date, I explained to Sweeney and my son that it was impossible for me to continue to spend $1,000 a month to carry on a business which during the last six or seven months had not been profitable, and arrangements were then made to re-lease the Company from its obligations under the contract of May 1932 and to release T. Edward Rassieur from his obligations under that contract.

"At a meeting of the Board of Directors of the Company held on January 7, 1933, the three directors, T. Edward Rassieur, John P. Sweeney and myself were present. The following is from the minutes of that meeting:

"'The Chairman explained that it has been impossible for the Company to carry on operations during the depression without constantly incurring loss; this was true while the Company was selling securities and it has been true also during the period while the Company has been selling T. E. Rassieur's Stock Market Service. This is no doubt due primarily to the depression, but the cost of operations has been entirely too great; and if the Company hopes to continue long enough to recover the losses on the International Telephone & Telegraph bonds and other securities held by it, it will be necessary to make a drastic cut in expenses. He proposed that the Company discontinue the sale of the Stock Market Service and that the Company also stay out of the business of dealing in securities, until times materially improve; that while the Company remains inactive, the officers of the Company should serve without compensation; that all employees of the Company be discharged and that the Company as soon as possible surrender the office now occupied by it in order to cut out rent expense; also that membership in the Investment Bankers Association be discontinued, but membership in the St. Louis Stock Exchange should be retained. With the interest charges of the Company reduced, through his assumption of bank debts, it will be possible for the Company to continue in business until the times improve, and with little or no current expense the Company will be able to use its income from its securities to make payments on account of principal. The Chairman therefore suggested that the following resolution be adopted:

"'Resolved that the Company shall reduce its current operating expenses in the manner outlined; that the officers of the Company be paid for the month of January, and to serve thereafter without compensation, until otherwise resolved by the board; that the employes of the Company be discharged, Miss Bronstein and James Patke to be paid until January 15th and William Rassieur until January 31st; that arrange-

ments be made to surrender the office premises at the earliest date in order to save the expense of rent; that the Company surrender and terminate its agreement with T. E. Rassieur for the marketing of Trend Interpretation Stock Market Service, with the understanding that all receipts from subscribers, when and as collected, for the month of January shall be paid to the Company, but prepaid amount and future payments covering the period from and after February 1st shall belong to T. E. Rassieur; commissions owing to agents accrued to January 31st shall be borne by the Company; commission installments accruing after January 31st shall be assumed by T. E. Rassieur; also that every effort shall be made by the officers to keep corporate expenses down to a minimum, until such time when the board determines that the Company should again resume active selling of securities.

" 'The above resolution was moved and seconded and unanimously adopted'."

After January 7, 1933, T. E. Rassieur "took over the bookkeeping and stenographic expense connected with the future operations of the company." During that time, the company had an annual income of $6,930 from interest on International Telephone & Telegraph Company bonds owned by it. At this meeting (January 7, 1933), Mr. Sweeney resigned as vice-president so that he could procure other employment, but retained his place as a director.

Expenses were reduced wherever possible. From a high of $6,616 (December, 1929), they were, with variations, reduced to $2,497.13 by September, 1931, and to slightly less than $1,000 by October, 1932, where they remained through January, 1933. Monthly salaries of the president (T. E. Rassieur) and the vice-president (John P. Sweeney) were progressively reduced from $1,000 to $150 by October, 1931. In January, 1933, the monthly payroll consisted of the above at $150 each, one employee at $125, one at $75 and one at $60. Two of these employees were discharged January 15, 1933, and one at the end of that month.

The two above officers received salaries for that month.

A meeting for dissolution of the company was held June 23, 1933. One feature of the dissolution was to transfer to taxpayer all of the stocks and bonds held by the company to apply on indebtedness due him from the company—these at then market value (plus accrued interest) amounted to $91,542.57.

*Financial condition.* At the end of the first six months of business, the company had an operating profit of $71,417.87, and gave every indication of being a very successful business[3]. Then the panic struck. At the end of the first year, there was an operating loss of $14,000.97.[4] For second year (ending April 30, 1931) such loss was $35,911.72; for the third year, $30,076.37, and for the last year (ending April 30, 1933), $2,952.40. The decrease in market value of securities owned by the company was, at the end of the same years, respectively, as follows: $4,367, $117,327.28 and $109,501.90, with an increase of $20,268.45 for 1933. At the end of the last fiscal year (April 30, 1933), the accumulated loss from *all* sources was $297,684.21, including operating losses of $82,941.46 and diminution in value of securities owned of $210,927.73 —of the operating losses, $36,000.00 were from uncollectible customers' accounts. The figures as to annual operating losses and as to market decline in securities owned clearly show, respectively, the effects of the panic upon volume of business and upon the assets of the company. They reveal the decline in market value of securities owned to be most important in the situation of the company. In September, 1931, the company owed banks $228,750. In October, 1931, taxpayer began extending financial help in various ways. By January, 1932, the combined indebtedness to banks and to taxpayer was $194,423. There were some monthly fluctuations below this last amount until December, 1932, when it was $177,577 and on April 30, 1933, $169.842. When the business closed, it owed $155,997.74, all due taxpayer.

---

[3] The progressive and increased prosperity of the company is shown by its monthly growth during this six months period as follows: for May, 1929 (the first month of business) there was a loss of $3,426.84; for June, a loss of $1,219.13; for July, a profit of $6,277.73; for August, a profit of $18,380.96; for September, a profit of $25,626.83; and for October, a profit of $25,778.32. At the rate of earnings shown by these last two months, the annual profit would have been over $300,000 or 120% on the capital stock.

[4] The "operating" loss is taken as the loss taking owned securities at cost.

From August, 1931, the principal asset of the company consisted of bonds of the International Telephone & Telegraph Company. August, 1931, the company owned as much as $250,000 of these bonds. This holding was reduced to $168,000 by April 30, 1932, and so continued to the end of 1932. At dissolution it was $154,000. These bonds were 4½% bonds due in 1939. Interest thereon never defaulted, even during the depression. In 1929, the market price had been as high as 224 and much of the purchase by this company was at 200. The annual trend of price from 1929–1938 is shown in footnote [2]. At market prices on dissolution of the company, these bonds represented $84,700 of the total assets of $91,-542.57—other stocks and bonds being $1,-776.96.

The company never failed to meet any obligation when due, but much of the time it could not have done so without advances from taxpayer. Without the advances made to or for the company by him it could not have remained in business as long as it did. These began in October, 1931. Until October, 1932, these advances consisted of leaving with the company money due taxpayer from security transactions through the company. In that month, there was a further advance (mainly through taking care of bank indebtedness) of about $115,000—to a total of $129,892. In November and December, 1932, there was a reduction to $113,-656 and $114,756, respectively. In January, 1933, this rose to $165,756; April 30, 1933, was $160,842; and at dissolution was $155,997.74. In December, 1932, taxpayer advanced $300 (December 12) and $800 (December 29) and on January 7, 1933, paid the last indebtedness (being to a bank) of $51,000. There was no legal or moral obligation upon taxpayer to make these advances. The reasons for such advances are stated by taxpayer—the situation bears out the truth thereof—as follows: "My willingness to continue to advance money was based on the thought that the Company would come back and that I would not be losing any money on it. My actions were based on the feeling and conviction that the Company would come back and that is the reason I put in from $11,000.00 to $165,000.-00. I had to keep on putting in in order to keep the Company going. I increased the money I loaned the Company to $165,000.00 by January, 1933. I did that because I was in hopes the $250,000.00 could be saved for

them and for me through what would happen in the future." There is no hint in the evidence of any bad faith on the part of taxpayer nor of any attempt to manipulate the time of this loss for his tax purposes.

■ Conclusion. The historical picture thus shown is as follows: A well financed general brokerage business wherein the company did a margin business in listed securities, a trading business in listed and unlisted securities, and dealt in securities on its own account. This business was increasingly prosperous and showed every indication of being highly successful until the panic struck. The panic struck this, as all other business, like a blight. Its business decreased and its owned securities diminished drastically in market values while expenses and indebtedness continued. In the endeavor to weather the storm and continue the business, various steps were taken, such as progressive restriction of business, curtailment of expenses, and sale of the "market service." It is evident that there was no time from 1931 to dissolution when it could have converted its assets, paid its debts and had anything remaining for stock value if it had been compelled to rely only upon its own resources and to liquidate. From the latter part of 1931, it could not have continued in business or paid its debts when due if it had been compelled to rely solely upon its own resources. However, the actual fact was that it did not have to so rely on its own resources alone. While there was neither legal nor moral obligation so to do, yet there were strong reasons of self-interest and probably of sentiment (help to his son) which impelled Theodore Rassieur to come to the financial aid of the company and he did so. The sole purpose of these two reasons was the same—to preserve the business. Unless that could be done, the taxpayer stood to lose at least the $250,000 he had contributed (for himself and the two others) to the capital stock; and his son would be out of business. The mere winding up of this business would have defeated the purpose entirely. There can be no question that this purpose to preserve the business was the dominant moving consideration of these three men, who held all of the capital stock, during this entire period. The accomplishment of the purpose depended entirely upon the willingness of taxpayer to make advances. As long as he continued willing, the business would last. As long as it lasted, there was

a prospect of its successful survival. This situation is one of the decisive factors in this matter. So long as taxpayer was willing to protect or pay the company debts and to advance funds for its current expenses, no one could say that any "identifiable events" had occurred which finally determined the worthlessness of the stock. See Ewing-Thomas Converting Co. v. McCaughn, 3 Cir., 43 F.2d 503, 504, 505.

■ Another factor, bearing upon the uncertainty of the ascertainment of the stock value and depending upon how long the company would be thus kept alive, was that its principal asset, during all of this period, was bonds of the International Telephone & Telegraph Company. During the early part of this troubled period, the company held $250,000 (par value) of these bonds and at dissolution it had $154,000 (par value) of them. For many of them, it had paid market of $200 in 1929. Although the depression seriously affected the market value of these bonds, there was never default in interest. There is no suggestion that the International was not entirely solvent at all times—even the market value of such bonds recovered a high of 97⅞ in 1936 and of 100¾ in 1938. That the confidence in the value of these bonds of taxpayer and his associates (during this period) was sound business judgment is verified by the facts. Mere market fluctuations of securities are not bases for deductible losses. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 401, 47 S.Ct. 598, 71 L.Ed. 1120; New York Life Ins. Co. v. Edwards, 271 U. S. 109, 116, 46 S.Ct. 436, 70 L.Ed. 859; Ewing-Thomas Converting Co. v. McCaughn, 3 Cir., 43 F.2d 503, 505; De Loss v. Commissioner, 2 Cir., 28 F.2d 803, 804, and see Ithaca Trust Co. v. United States, 279 U. S. 151, 155, 49 S.Ct. 291, 73 L.Ed. 647, and Lewellyn v. Electric Reduction Co., 275 U. S. 243, 247, 48 S.Ct. 63, 72 L.Ed. 262.

■ During the panic, there were progressive contractions of business caused by desire to decrease expenses. Every such contraction was with no purpose of ending the business, but always in the effort to sustain and continue it as a going concern. Such temporary necessities are not determinative of loss. See Benjamin v. Commissioner, 2 Cir., 70 F.2d 719, 720, where there was complete temporary cessation of business but with intent and effort, unrealized, to continue later; and see Rosing v. Corwin, 2 Cir., 88 F.2d 415, 416. Certainly there is no word in the evidence which supports any conclusion that taxpayer or his associates had any thought, before 1933, otherwise than to continue the business indefinitely. Up to the end of 1932, taxpayer was advancing funds for that sole purpose and his associates and a small office force were continuing the business. The first intimation of any change of this attitude occurred early in January, 1933, when taxpayer received the statement of December 31, 1932, which came to him "a couple of days after that date." At that time, he explained to his associates that "it was impossible for me to continue to spend $1,000.-00 a month to carry on a business which during the last six or seven months had not been profitable." Even then, there was no thought of terminating the business, but, at most, a temporary suspension until general business conditions should become better. Another matter at that time was that an indebtedness to a bank of $51,000 (which was secured by collateral and by endorsement of taxpayer) was coming due on January 7th. As a result of this situation, on January 7, 1933, the directors passed the resolution hereinbefore quoted. It will be observed that this resolution and the connected minutes expressly avowed a purpose to suspend only temporarily and to resume when "times improve." The sole purpose of suspension was to eliminate expenses temporarily. The company then had a monthly income from interest on its International bonds of $577.-50. It retained its membership in the St. Louis Stock Exchange—undoubtedly, as a means of future prosecution of its business. Even at this time, there was no thought of ending the business and there was no business pressure of debts or otherwise to compel or induce its wind-up. It was not until June that taxpayer gave up the idea of the company going back into business and convinced his associates. The dissolution resolution was on June 23, 1933.

Had the company done nothing more than continue to exist until 1936, it could have sold its securities and realized $23,000 over all indebtedness. In 1938, it would have realized appreciably more. Taxpayer took over these securities and actually realized these returned prices.[5] It cannot be said

---

[5] As to International bonds, taxpayer took over the $154,000 (par value) in June, 1933, at market, 55, and sold $5,-000 at 89, $65,000 at between 90 and 99,

that the idea of keeping the company alive to give value to the stock represented a "foolish optimism" and there is no substantial evidence to sustain that conclusion by the Board.

█ The vital error of the Board is that it treats the situation as though the picture comprehended only the ability of the company itself, and unaided, to go forward. It ignores the controlling facts that taxpayer was willing to; that it was to his financial interest; that he did advance money as needed to meet obligations and pay running expenses; and that the company always held valuable securities which its stockholders believed, correctly, would carry the company through. There was no substantial testimony to sustain the finding that any definitive act or situation making certain the worthlessness of this stock occurred before 1933. There was an "identifiable event" here to determine when this stock became worthless and that event was the decision, in 1933, to terminate the business. Brown vs. Commissioner, 6 Cir., 94 F.2d 101, 103; Gowen v. Commissioner, 6 Cir., 65 F.2d 923, 924.

█ There have been many cases (including stock losses) dealing with identification of the tax year wherein a loss became an allowable deduction.[6] While study of these cases has been useful to us, yet each case must be resolved on its own fact situation. Morton v. Commissioner, 7 Cir., 112 F.2d 320, 321; Moore v. Commissioner, 2 Cir., 101 F.2d 704, 706.[7] There are two cases in this Court which are somewhat suggestive here. In Burnet v. Imperial Elevator Co., 8 Cir., 66 F.2d 643, where an embarrassed business had been turned over to a creditors' committee with power to make such disposition of assets in liquidation as it deemed best and with power to authorize the taxpayer to borrow for the purposes of its business and the company continued in operation thereafter, we held the stock loss occurred in the next tax year when the as-

sets were sold and were insufficient to pay debts. In Eagleton v. Commissioner, 8 Cir., 97 F.2d 62, where taxpayer had kept the company business going during 1930 and during 1931 up to September, when it ceased all business operations, we sustained the Board in holding the loss sustained in 1931 although the assets were not turned over to taxpayer until in 1932, during which year the company was dissolved. In the last case, the Board distinguished Deeds v. Com'r, 14 B.T.A. 1140; Cushman v. Com'r, 13 B.T.A. 41; Slater v. Com'r, 12 B.T.A. 60 and News Pub. Co. v. Com'r, 6 B.T.A. 1257 "in that they involved going concerns whereas in the instant proceeding the corporation had ceased to do business in the prior year" (1931). Here, the company never entirely suspended business nor had any intention of so doing until 1933 and taxpayer never had any intention of withdrawing his support until that year. "We feel that the taxpayer * * * not only used good judgment in his appraisement of the situation and in his withholding of a claimed loss until * * * total loss became apparent beyond controversy, but has acted in the utmost good faith." Dunbar v. Commissioner, 7 Cir., 119 F.2d 367, 370, 135 A.L.R. 1424. The stock loss of $50,000 was an allowable deduction in 1933.

## II. The Notes Loss.

█ What has been said about the "stock loss" is determinative of the loss on the two notes secured by stock, because the taxpayer could not, in the nature of things, "ascertain" that the stock had become worthless until it had actually become worthless. However, there are additional considerations as to the notes. The question as to the "stock loss" was the time when the stock definitely and actually became worthless. The question as to the notes is when taxpayer reasonably and honestly "ascertained" the stock, back of the notes, was worthless. This *ascertainment* must be by the taxpay-

---

and $84,000 at between 100⅛ and 100⅝ —of these sales $30,000 were in January, 1936, at 97 to 99.

6 Many such cases may be found in case notes in 55 A.L.R. 1280, 67 A.L.R. 1015, 121 A.L.R. 697, and 135 A.L.R. 1430. Also in Shepard United States Citations to the case of United States v. S. S. White Dental Mfg. Co., 274 U. S. 398, 47 S.Ct. 598, 71 L.Ed. 1120.

7 Cases having some of the fact characteristics of this case are Dunbar v.

Commissioner, 7 Cir., 119 F.2d 367, 135 A.L.R. 1424; A. R. Jones Oil & O. Co. v. Commissioner, 10 Cir., 114 F.2d 642, 645, 646; Blair v. Commissioner, 2 Cir., 91 F.2d 992; Olds and Whipple v. Commissioner, 2 Cir., 75 F.2d 272; Benjamin v. Commissioner, 2 Cir., 70 F.2d 719; Tsivoglou v. United States, 1 Cir., 31 F.2d 706, and Saylor Elec. & Mfg. Co. v. United States, D.C.E.D.Mich., 33 F. Supp. 310.

er. Duffin v. Lucas, 6 Cir., 55 F.2d 786, 795. Necessarily, there is usually a range of time after actual worthlessness within which a taxpayer may so *ascertain*.

■ Taxpayer knew the condition of this company from monthly reports. He knew that from a prosperous, growing business it had been struck down by a panic which affected all business. He knew it owned valuable solvent securities which had been drastically reduced in market value by the panic. He had reason to think, and did think, that the business would go ahead if it could weather the depression. He knew, from in 1931, that liquidation of the business would wipe out the stock value. It was his money in the business. His only prospect of saving that money was to tide the business over to better times. He did this consistently until 1933. Even in January of that year, he assumed, or paid, $51,000 to do this. He did this in the belief that the securities held by the company would come back in the market. This belief was reasonable at all times and was confirmed by subsequent events. See Clark v. Commissioner, 3 Cir., 85 F.2d 622, 625. This belief continued until June 23, 1933, when he first concluded that it was better to give up the idea "of this company ever going back into business." There is no dispute in the evidence about this situation and no room for an unfavorable inference of fact therefrom.

There is no substantial evidence to support denial of the deductions of these notes as bad debts in 1933 and they should be so allowed.

The order of the Board should be and is reversed.