### SMITH et al. v. UNITED STATES.

### SPARK et al. v. SAME.

Nos. 6433, 6587.

District Court, D. Massachusetts.

Aug. 3, 1936.

Nichols, Boyer & Morton, of Boston, Mass., for plaintiffs Smith and others.

Hale & Dorr and W. H. Brown, all of Boston, Mass., for plaintiffs Spark and others.

Francis J. W. Ford, U. S. Atty., Arthur L. Murray, Sp. Asst. to the U. S. Atty., both of Boston, Mass., Robert H. Jackson, Asst. Atty. Gen., and Andrew D. Sharpe and Fred J. Neuland, Sp. Assts. to the Atty. Gen.

BREWSTER, District Judge.

The above actions at law present the same issue. They were tried together upon stipulations and testimony, and may conveniently be disposed of in one opinion. The plaintiffs in each of the actions represent testators who, in 1932, owned stock in the Atlantic National Bank. In each case the plaintiffs seek to recover income tax assessed and paid upon 1932 income of his respective testator. The sole controversy is whether the taxpayer was entitled to deduct from the gross income the cost of his shares in the bank as a loss deductible under section 23 (e) of the Revenue Act of 1932 (26 U.S.C.A. § 23 (e) and note).

In law No. 6433, the amount claimed is $41,706.84, based upon a deduction claimed of $193,680, representing the cost of 9,684 shares which were purchased by the testator on March 8, 1932, and were owned by him until his death on February 11, 1933. In the return of 1932 income, filed by his executors, no deduction was claimed for any loss on account of these shares.

In law No. 6587, the amount claimed is $35,383.52, based upon a deduction claimed of $954,981, representing the cost of 33,226 shares, purchased by the testator from time to time subsequent to March 1, 1913, and which were owned by him at the time of his death, February 15, 1934. The taxpayer claimed no deduction on account of these shares in his return of 1932 income.

In 1935 claims for refund were duly filed by the plaintiffs in their capacity as executors.

The statute and regulations which govern are section 23 (e) of the Revenue Act of 1932 and article 174 of Regulations 77.

Section 23 provides that "in computing net income there shall be allowed as deductions * * * (e) Losses by Individuals. [Subject to the limitations provided in subsection (r) of this section. (Not here material.)]

"In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—(1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business."

Article 174 of Regulations 77 is as follows:

"Shrinkage in value of stocks. A person possessing stock of a corporation can not deduct from gross income any amount claimed as a loss merely on account of shrinkage in value of such stock through fluctuation of the market or otherwise. The loss allowable in such cases is that actually suffered when the stock is disposed of. If stock of a corporation becomes worthless, its costs or other basis as determined and adjusted under section 113 [26 U.S.C.A. § 113 note] is deductible by the owner in the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness. * * *"

The real issue here is whether in 1932 these shares of stock in the bank had become worthless within the meaning of the Regulations, and therefore a deductible loss under section 23 (e). On this issue I find, in addition to the foregoing facts, that the bank had a capital stock of 895,000 shares of the par value of $10 each; that the stock was bought and sold on what is known as

"over the counter" market, and in January, 1932, was quoted at about $15.75 a share; on March 30 at $14.75; on May 3 at $5.50; between May 3 and December 31, 1932, quotations ran between 10 cents and $1.50 per share. Since December 31, 1932, it has never been quoted above 40 cents a share. After May 3, 1932, it was impossible to sell the stock at any price unless under a plan that did not involve the statutory liability of a holder of national bank stock.

For some time prior to May 3, 1932, there had been a run on the Atlantic National Bank of Boston, and on May 3, 1932, the bank closed and ceased to do business. On the same date the said bank entered into a contract with the First National Bank of Boston whereby said First National Bank agreed to accept the assets and assume the deposits and other liabilities, with a stipulation that, in the event the assets failed to realize sufficient to cover the deposits and other liabilities, the stockholders would be assessed an amount sufficient to cover the deficit, as prescribed by the National Banking Act (12 U.S.C.A. § 21 et seq.) relating to double liability. Under the terms of the contract, a period of three years was allowed the First National Bank within which to liquidate the assets of said Atlantic National Bank, with the privilege of applying for an extension of one year to carry out this purpose. At a special stockholders' meeting, held June 7, 1932, the agreement between the Atlantic National Bank and the First National Bank was ratified. Effective June 25, 1932, the said Atlantic National Bank went into voluntary liquidation subject to the contract hereinbefore mentioned. On and after June 25, 1932, the stock transfer books of the Atlantic National Bank were closed. Thereafter no stock was transferred on the books of the corporation or sold, except such shares as might be sold without any liability on the part of the purchaser to pay any subsequent assessment upon the shares so sold.

The outstanding capital stock of the Atlantic National Bank was $8,950,000 divided into 895,000 shares of the par value of $10 each. The capital stock and surplus of the Atlantic National Bank as shown by its books of account and records as at the date the contract was entered into between it and the First National Bank of Boston on May 3, 1932, was $16,257,818.85; as of October 31, 1933, $12,152,034.06; and as of October 31, 1935, $10,546,233.42, respectively. The capital stock and surplus of said bank on the above respective dates is based upon the book value of the assets in excess of the liabilities of said Atlantic National Bank as set forth in a statement sent to the shareholders of stock of the Atlantic National Bank by the liquidating agent on March 3, 1936.

During 1932 there was no official appraisal made of the assets of the Atlantic National Bank. On all the evidence I find that the stock became worthless during the year 1932, and that the bank was insolvent in that year. I am unable to accept, as sound, the argument of the defendant that the books created a presumption of solvency. I think it is so far a matter of common knowledge that the court may take judicial notice of the fact that the book value in 1932 of securities and discounts of a bank would not reflect the real value of these assets.

Expert testimony was offered which, if believed, would establish insolvency in 1932, notwithstanding the statements and reports of the First National Bank which dealt only with book valuation. I quite agree that such evidence is not binding upon the court, but I know of no rule of law which requires the court to disregard this testimony when it appears to be based upon intelligent and logical reasoning. The witness had made a careful investigation into the process of liquidation and was able to say what, in view of rising markets, was obviously the fact; that the liquidation by the First National Bank produced from the assets greater results than could possibly have been produced in 1932, and, since the ultimate result of the liquidation is a deficiency of over $8,000,000, requiring the Comptroller to levy an assessment, under the federal law, upon stockholders to the full extent of the par value of the shares, it is reasonable to conclude that the bank must have been insolvent in 1932.

The fact that after the bank closed the stock was quoted in the market at a few cents per share without carrying stockholders' liability does not justify the conclusion that the stock had not become worthless in 1932. Wesch v. Helburn (D. C.) 5 F.Supp. 581.

Having reached the conclusion that the stock became worthless in 1932, not only by reason of the insolvency of the bank but by the fact that there was abso-

lutely no market for the stock with stockholders' liability attached, the question remains whether this worthlessness became reasonably apparent during that year, or, as sometimes stated, whether it was established directly or indirectly by some identifiable event occurring in 1932.

The rule to guide one in arriving at the answer to this question is well stated in the case of Royal Packing Co. v. Com'r of Internal Revenue (C.C.A.) 22 F.(2d) 536, at page 538, where the court says: "The applicable principles of law are not in controversy, and we content ourselves with little more than a bare statement of them. The taxpayer was not entitled to the deduction merely because the stock may have subsequently become worthless or because, in the light only of subsequent developments, it may appear to have been inherently worthless during the year in question. Nor can the deduction be claimed for a mere shrinkage in value. A loss may be said to be actually sustained in a given year if, within that year, it reasonably appears that such stock has, in fact, become worthless. It is not requisite that there be a charge-off on the books of the taxpayer, and the ultimate fact of worthlessness may be shown by circumstances, as in other cases where that question is in issue."

This statement has been accepted in Forbes v. Commissioner (C.C.A.) 62 F.(2d) 571, 573, and, appears to be consistent with the decisions of the United States Supreme Court in United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120, Lewellyn v. Electric Reduction Co., 275 U.S. 243, 48 S.Ct. 63, 72 L. Ed. 262, and Lucas v. American Code Co., 280 U.S. 445, 449, 50 S.Ct. 202, 203, 74 L. Ed. 538, 67 A.L.R. 1010. In the Lucas Case, the court observed: "The general requirement that losses be deducted in the year in which they are sustained calls for a practical, not a legal, test.".

If it is necessary to point out identifiable events occurring in 1932, we have the run upon the bank, the liquidating agreement with the First National Bank, and the vote of the stockholders to go into voluntary liquidation subject to the contract with the First National Bank, and the closing of the transfer books of the bank at that time.

In Matter of Lewis B. Hoffman (D.C.E. D.Pa., April 27, 1936) 16 F.Supp. 391, the government contended, as the plaintiffs here contend, that the loss upon bank stock was sustained for tax purposes in the year in which the bank was closed and liquidation was begun, rather than in the year in which liquidation might be completed. The court sustained the government's position, saying:

"To say that stockholders of a bank which has been closed by order of the authorities and ordered liquidated do not sustain a loss upon their stock until some subsequent date when liquidation finally takes place or until the official appraisement of the bank's assets seems to me to be losing touch with reality. It is just conceivable that cases might arise in which some realization could be had by the stockholders in the long future. As a practical matter, however, the business world never remotely considers that contingency. To all intents and purposes the stock of a bank becomes unsalable at any price when the bank is taken over and liquidation begins.

"The government's position that the loss occurred in the year in which the bank was closed is in accordance with the general practice of the Department. There is no formal regulation and it would not be controlling if there were, but it is certainly a sensible, practical rule and in accordance with actual facts. I therefore hold that the bankrupt's loss in the Franklin Trust Company stock was sustained in the year 1931 and not in the year 1932."

In law No. 6587 judgment may be entered for the plaintiffs in accordance with their motion for judgment.

In law No. 6433 judgment may be entered for the plaintiffs in accordance with their motion for judgment.