## BANCROFT v. UNITED STATES, and five other cases.

Nos. 43816, 44632, 44633, 43846, 43785, 43803.
Court of Claims.

June 3, 1940.

Charles B. Rugg, of Boston, Mass. (John Richardson, H. Brian Holland, James T. Mountz, and Ropes, Gray, Boyden & Perkins, all of Boston, Mass., on the brief), for plaintiffs.

S. E. Blackham, of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and GREEN, LITTLETON, and WHITAKER, Judges.

WHITAKER, Judge.

The plaintiffs in all of the above styled cases were stockholders in The Atlantic National Bank of Boston. On May 3, 1932, this bank closed its doors and entered into an agreement with The First National Bank of Boston for the liquidation of its affairs. This liquidation proceeded until March, 1936, when the Comptroller of the Currency appointed a receiver and levied an assessment against the stockholders of the bank, which was satisfied on August 17, 1936, by the payment of $1.75 per share. The question presented is the year in which the stock of the Atlantic became worthless and its stockholders thereby sustained a loss.

The Commissioner of Internal Revenue has held that the loss was sustained in 1932. In the cases of Bancroft v. United States, Baker v. United States, and First National Bank of Boston et al. v. United States (No. 44633) the plaintiffs filed claims for refund claiming the loss was sustained in 1936. In the Maddison and DeBlois cases the plaintiffs claimed the loss was sustained in 1932, and in the case of First National Bank of Boston et al v. United States, No. 44632, the plaintiff claimed the loss was sustained in 1935. They all now take the position that the loss was sustained in 1936.

Section 23(e) of the Revenue Act of 1936, 26 U.S.C.A.Int.Rev.Code, § 23(e), permits a deduction of "losses sustained during the taxable year and not compensated for by insurance or otherwise." Article 23(e)—1 of Treasury Regulations 94 provides, in part: "In general losses for which an amount may be deducted from gross income must be evidenced by closed and completed transactions, fixed by identifiable events, bona fide and actually sustained during the taxable period for which allowed. Substance and not mere form will govern in determining deductible losses." Article 23(e)—4 provides, in part: "If stock of a corporation becomes worthless, its cost or other basis as determined and adjusted under Section 113 is deductible by the owner for the taxable year in which the stock became worthless, provided a satisfactory showing is made of its worthlessness." Articles 141 and 144 of Treasury Regulations 45 contain provisions similar to the above except that in them it is not provided that the loss should be fixed by identifiable events. These regulations were approved by the Supreme Court in United States v. S. S. White Dental Mfg. Co., 61 Ct.Cl. 143; Id., 274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120.

The question presented is one of fact. It was presented to the District Court of Massachusetts in the case of Smith v. United States, D. C., 16 F.Supp. 393. That court held that the stock became worthless in 1932 when the bank closed its doors. It relied upon and quoted from the opinion of the District Court for the Eastern District of Pennsylvania in the case of In re Hoffman, D. C., 16 F. Supp. 391, which was later affirmed by the Circuit Court of Appeals, 3 Cir., 87 F.2d 200. The facts in the two cases are the same except that in the Hoffman case the bank had been closed by order of the authorities, whereas, in the Smith case it voluntarily closed.

We are unable to agree with the District Court that this loss occurred in 1932. The record before that court was by no means so full as the one before us. What its decision would have been had it had before it all the facts now presented is a matter of conjecture.

After a report of the national bank examiner in November 1931 had shown that the bank's affairs were in an unsatisfactory condition, its representatives met with representatives of the First National Bank and of the National Shawmut Bank of Boston, the two largest banks in Boston, with the view of increasing its capitalization, and so putting it on a sound financial basis. The representatives of these three banks agreed among themselves that ad-

ditional capital of $8,000,000 would adequately protect the bank, but that if $10,000,000 of additional capital could be secured, the position of the bank would be impregnable. It was decided to raise $10,000,000. The Atlantic stockholders, to whom one-half of the stock was offered, immediately subscribed more than their allotment. The other one-half of the stock was to be subscribed for by the clearing-house banks in Boston. These banks did not subscribe directly for the stock, but instead loaned to the Post Office Square Securities Corporation $5,000,000 with which this corporation purchased the remaining $5,000,000 of the new capital, pledging this stock as security for its note with the banks. The new stock was sold at a price of $20 a share, $10 of which was paid-in surplus. The par value of the old stock in the bank was reduced from $25 a share to $10 a share.

This readjustment of its capital took place on March 8, 1932. At that time it is beyond question that not only the bank's own stockholders, but also the other financial institutions of the City of Boston believed that the stock in the bank was worth approximately what they paid for it. They were not making donations to charity.

Nothing happened in the year 1932 to make them change their minds except the closing of the bank and the transfer of its assets to the First for liquidation. Was this sufficient to cause them to reverse their opinion of two months ago? We think not. The bank was closed not because it was insolvent or because the stockholders believed it to be insolvent, but because confidence in it had been impaired and because the deposits were constantly declining, culminating in a run on the bank for several days prior to its closing. No bank, of course, maintains its affairs in a sufficiently liquid state to pay all of its depositors at one time. For exactly this reason it was necessary for it to close its doors and liquidate its affairs gradually. There is nothing to indicate that such a gradual liquidation would not have produced amounts sufficient to return to the stockholders their investment or a substantial part thereof, except only the fact that no institution in liquidation can realize from its assets as much as it can as a going concern. But while this made the value of the stock decline in value, it certainly did not make it worthless. Lyon v. United States, 78 Ct.Cl. 545, 5 F.Supp. 138.

In this connection it is interesting to note that the records of the office of the Comptroller of the Currency show that of the 6,007 banks which went into voluntary liquidation from 1865 to 1938 and transferred their assets to some other bank, only 258 of them later went into the hands of a receiver. His records further show that of the 2,974 banks that actually went into the hands of a receiver in the years 1865 to 1939, 293 of them, or about 10 percent, have paid their creditors in full, leaving $6,000,000 in cash and $35,000,000 book value of other assets for distribution to the stockholders. The mere closing of the doors of this bank did not make its stock worthless.

The only other things which happened in this year which reflect on the value of this stock are the reports of the senior national bank examiner for the First Federal Reserve District on the loan of the First National Bank to the Post Office Square Securities Corporation, which was secured by the Atlantic's stock. On June 24, 1932, he classified this loan as '50 percent "loss," 25 percent "slow," and 25 percent "doubtful." Subsequently, in November 1932, and again in June 1933, he classified it as 75 percent "loss" and 25 percent "doubtful." It thus appears that in the opinion of this qualified authority there was in 1932 a not inconsiderable prospect of realizing a substantial amount on this stock. If this be true, it cannot be said that the stock was then worthless.

Nor can we say this stock was worthless in 1934. In that year the bank's total liabilities were $19,220,900.41, all of which it owed to the First National Bank. It was proposed to discharge this indebtedness by a loan of $12,000,000 from the Reconstruction Finance Corporation and by the sale to the First of a portion of its assets for $7,029,000. The Reconstruction Finance Corporation made an appraisal of all of its assets, exclusive of those to be sold to the First National Bank, at $14,861,245.18. This, added to the $7,029,000 to be paid by the First National Bank, gives a total valuation for all of its assets of $21,890,245.18, an excess of assets over liabilities of $2,669,344.77. It then had 895 shares of stock outstanding, which indicated a value of about $3 a share. The par value of the shares was $10.

In view of the foregoing, we do not think it can be said that the stock was

worthless even as late as July 1934, the date of the appraisal by the Reconstruction Finance Corporation.

██ However, an event happened in 1935 which in our opinion demonstrated in that year that the stock was worthless.

The liquidation agreement between the First National Bank and the Atlantic National Bank provided for a liquidation over a period of three years, subject to the option of the First National Bank to extend this period for an additional time not to exceed one year. If at the end of the liquidation period the proceeds of the assets had not been sufficient to repay the First for the liabilities assumed, the First had the right to demand payment from the Atlantic of this deficiency, and upon default in its payment, to assert against the Atlantic stockholders a demand for the payment of their additional stockholders' liability in an amount sufficient to meet the deficiency.

Just before the expiration of the three-year term the First extended the liquidation period, not for an additional year, but only until November 30, 1935, since two large stockholders of the Atlantic had died since the liquidation agreement and the time within which the First could assert claims against their estates for additional stockholders' liability would shortly expire. Two days after the expiration of this extension on December 2, 1935, the First made demand on the Atlantic for the payment of the balance due on the liabilities assumed. The Atlantic was unable to meet the demand. Thereupon the liability of the Atlantic stockholders for any deficiency became fixed.

A rough appraisal of the Atlantic's remaining assets made by representatives of the First and of the Atlantic at about this time showed a deficit of $2,278,946, based upon an immediate sale. Based on liquidating the assets over a three-year period, they were appraised at something over a million dollars more than the liabilities; but it seems to us that only their cash price was material. The liquidation period was over. When it expired the First had the right to put up the remaining assets for immediate sale. What the assets would bring if the contract were carried out according to its terms is the material inquiry; not what they would bring if the contract was voluntarily set aside or amended. If this be correct, on the date of the default in meeting the demand of the First the stockholders of the Atlantic became liable for the payment of approximately $2,278,946, and the value of their stock was then extinct. It is true the First did not put up for sale the Atlantic assets, but their forbearance to do so was a matter of grace, and not a right which the Atlantic stockholders could demand. United States v. S. S. White Dental Mfg. Company, 61 Ct.Cl. 143; Id., 274 U.S. 398, 402, 47 S.Ct. 598, 71 L.Ed. 1120.

We hold accordingly that the stock was determined to be worthless not later than the date of the demand of the First for the payment of the deficiency. At that time "all reasonable possibility of realization of something on the stock" was "destroyed." Montgomery v. United States, 87 Ct.Cl. 218, 23 F.Supp. 130, certiorari denied, 307 U.S. 632, 59 S.Ct. 833, 83 L.Ed. 1514; Forbes v. Commissioner, 4 Cir., 62 F.2d 571.

It results that the petitions of Jane Bancroft v. United States, No. 43816, and of the First National Bank of Boston and Annie B. Coolidge, Executors under the will of Emily L. Ainsley, deceased, v. United States, No. 44633, and William E. Baker v. United States, No. 43846, and of Arthur N. Maddison, Executor of George L. DeBlois, v. United States, No. 43785, and Mary B. DeBlois v. United States, No. 43803, must be dismissed; and it further results that plaintiffs in First National Bank of Boston and Annie B. Coolidge, Executors under the will of Emily L. Ainsley, deceased, v. United States, No. 44632, are entitled to recover of the defendant the sum of $1,056.50, with interest as provided by law. It is so ordered.