**OLD COLONY TRUST ASSOCIATES v. HASSETT, Collector of Internal Revenue.**

**Civil Action No. 2321.**

District Court, D. Massachusetts.

June 22, 1944.

George R. Blodgett, Hugh D. McLellan, and Kenneth W. Bergen (of Herrick, Smith, Donald, Farley & Ketchum), all of Boston, Mass., for plaintiff.

Fred J. Neuland, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe, Sp. Asst. to Atty. Gen., and Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., for defendant.

SWEENEY, District Judge.

This is an action to cover an alleged overpayment of income taxes and interest for the calendar years 1935 and 1936.

### Findings of Fact.

The plaintiff is a corporation within the meaning of the Internal Revenue law doing business as an investment or business trust with its principal place of business in Boston. As of July 26, 1932, it was the owner of about 40% of the stock of the Everett Trust Company, which will hereinafter be referred to as the "old bank", a banking institution organized under the laws of the Commonwealth of Massachusetts. Prior to that date the old bank was in a bad financial condition. On July 26, 1932, effecting a plan that had been discussed with the Commissioner of Banking for the Commonwealth of Massachusetts, the Everett Bank & Trust Company, which will hereinafter be referred to as the "new bank", was incorporated and the plaintiff acquired control of the new bank by the acquisition of more than 75% of its capital stock for which it paid a total amount of $335,880. On the same day the plaintiff advanced to the old bank $900,000 in cash to avoid having that bank declared insolvent with the possibility of stockholders' assessments. At the time that it made this advance the plaintiff received from the old bank its demand note in the amount of $900,000 and certain collateral securities which on that date had a market value of $247,683.50. It was provided in the note that the plaintiff was to look to the income from the securities as its only source for interest on the advance. On the same date the old bank transferred to the new bank all of its assets and the new bank assumed all of the liabilities of the old bank except the old bank's liability for the $900,000 advancement.

When the incidental transfers were complete we find the new bank organized with all of the old assets of the old bank as well as the $900,000 asset and subject to all of the liabilities of the old bank except the liability on the advance made by this plaintiff. We also find that on this new set-up there was no necessity for an assessment against the stockholders of the old bank and, in fact, none was ever made. The old bank in the course of time went out of existence by operation of law.

Any equity in the value of the securities transferred to the plaintiff over and

above the amount of the $900,000 advanced to the old bank became the property of the new bank. The plaintiff held these securities and sold them during the years 1934, 1935, and 1936, receiving an aggregate amount of $529,553.34 for them. It is the contention of the Government that the difference between their market value on July 26, 1932, in the amount of $247,683.-50 and the aggregate price for which they were sold, namely $529,553.34, was a taxable gain to the plaintiff. It is the plaintiff's contention that, since it actually suffered a loss by reason of its advance to the old bank, not only is there no gain taxable to it, but that, in addition, it is entitled to charge off as a bad debt the sum of $370,446.66.

Another claim advanced by the plaintiff, which reports income on the accrual basis, is the right to deduct from its 1935 return the sum of $47,455.53 as legal and auditing fees paid during that year in fulfillment of an obligation. The services for which this deduction is sought were rendered during the years 1933 and 1934 but were first billed to the plaintiff in 1935. The Commissioner in disallowing these deductions took the position that they should have been charged off during the years when the actual services were rendered.

When the taxpayer filed its return for the year 1935 it reflected a net loss with no taxes due but the Commissioner declared a deficiency tax for that year which the plaintiff paid and now seeks to recover. The amount now involved, after a partial refund that has already been made, is in the amount of $15,492.99.

When the plaintiff filed its return for the year 1936 it again reflected a net loss with no taxes due and again on re-audit the Commissioner declared a deficiency which the taxpayer paid and now seeks to recover. This amount, after allowing for a partial refund to the plaintiff which has already been made, now amounts to $3,-546.84.

As to the years in question there are involved the following questions:

1. Did the plaintiff receive taxable gain in 1935 and 1936 by reason of the sale of the securities pledged with it as collateral for its $900,000 advance?

2. Is the plaintiff entitled to a deduction for legal and auditing fees paid by it in 1935 for services rendered in 1933 and 1934?

3. In the year 1936 is the plaintiff entitled to a bad debt deduction by reason of its loss on its $900,000 advance to the old bank?

■ Treating question No. 2 first, it seems to the Court that the Commissioner's determination that the legal and auditing fees should have been charged off during 1933 and 1934 when the work was done cannot be sustained. From the supplemental stipulation filed by these parties it clearly appears that the legal and auditing fees charged to the plaintiff were not determined until January 1935 when bills were sent to the plaintiff. It further appears that such payments as had been received during 1933 and 1934 by the legal firm involved were merely payments on account and without reference to the final bill to be rendered. I therefore find that the fees were ordinary, necessary and reasonable in amount and that since they could not be determined until 1935 they were properly deductible during that year.

■ The other two questions must be determined in accordance with our view of the reality of the transaction that occurred between this taxpayer and the old and new banks on July 26, 1932, for if it is ascertained that the actual title and ownership of the securities were in the old or new banks and merely pledged for a loan we might reach one result. If, on the other hand, we disregard the legal niceties of the transfers and determine the actual ownership on the date in question to be in the plaintiff, then a different result will be reached. The taxpayer asks us to consider the transaction as a normal loan by it to the old bank with the taking of securities to guarantee the loan. It points to its method of carrying the securities on its books as evidence that it never owned the stock and it argues that any equity over and above its advance of $900,000 had to be returned to the new bank. It points to these and other things as indicating an ordinary run-of-the-mill loan with collateral security. I think that the Commissioner was not limited in his view of the transaction to its outward appearance. In the first place, the plaintiff was loaning money to a bank by whom it could never be repaid for the old bank was ceasing to do business as of that date and the new bank was not liable for the advance although it got the proceeds. The plaintiff could look only to the collateral securities for the repayment of its loan and indeed could only

collect interest from the income of those securities. It is perfectly apparent that the bank was willing to advance $900,000 on collateral of $247,683.50, not because it thought that the loan was good, but because the plaintiff itself stood to face a possible assessment as a stockholder of an insolvent bank. The note that it received from the old bank was a demand note and the securities received under the terms of the loan could have been sold the next day. The bank chose to keep the securities until they had retrieved part of their loss. Their action in retaining the securities was wise as the ultimate loss to the bank has been greatly minimized but there is no doubt in my mind that the entire transaction of July 26, 1932, served factually to transfer the ownership of the securities to the plaintiff.

The value that we must set on the securities on July 26, 1932, is the fair market value of those securities which was $247,-683.50. Since I view the transaction of July 26, 1932, as a closed transaction on that date, then it follows that the Commissioner's determination that the plaintiff had a taxable gain from the sale of these securities in 1934, 1935, and 1936 was correct, and it logically follows that his determination that there could be no deduction for a claimed loss in 1936 was also correct.

The plaintiff's claim to a bad debt deduction in its 1936 return for the difference between the face amount of the loan and the amount realized from the sale of the securities demonstrates the one fallacy in their argument and that is that they do not include in the amount of their advance anything for having avoided an assessment on their 30,345 shares of the capital stock of the old bank.

### Conclusion of Law.

1. From the foregoing I conclude and rule that the plaintiff did receive taxable gains in 1935 and 1936 on the sale of the pledged securities and that the Commissioner's determination of such gains was correct.

2. I also conclude and rule that the plaintiff was entitled to deduct in its return for 1935 legal and auditing fees paid by it during that year for services rendered in 1933 and 1934.

3. I also conclude that the plaintiff was not entitled to the bad debt deduction in 1936 for the difference between the face amount of their loan and the amount real-

ized on the sale of the securities received from the old bank.

Judgment including interest is to be entered in favor of the plaintiff on the basis of the foregoing. If the parties cannot agree on the amount of the judgment, on application the Court will determine that amount.

The plaintiff's motion for judgment in the amounts named in that motion are denied.