**C. A. LAYSTROM et al.**

v.

**CONTINENTAL COPPER & STEEL INDUSTRIES, Inc.**

No. 51 C 1405.

United States District Court
N. D. Illinois.
June 29, 1955.

Frank D. Mayer, Louis A. Kohn, Harry Adelman, Francis W. Collopy, Mayer, Friedlich, Spiess, Tierney, Brown & Platt, Chicago, Ill., for plaintiffs.

Charles R. Sprowl, Whitney Campbell, James J. Magner, Taylor, Miller, Busch & Magner, Chicago, Ill., for defendant.

HOFFMAN, District Judge.

This is an action brought by the former stockholders [1] of Quality Hardware and Machine Corporation to recover from the assignee of the purchaser of the stock an alleged balance on the price agreed to be paid for the stock.

The original contract for the sale of the stock was entered into on July 22, 1944, between substantially all the owners of stock of Quality Hardware and Machine Corporation, as sellers, and Chester A. Bolles, as buyer. The purchase price was fixed as a sum equal to the net worth of the Corporation plus 50% of the net profits for the next five years. Approximately $900,000 was paid to plaintiffs on July 31, 1944, for the net worth of the Corporation and more than $100,000 was paid to the plaintiffs for their share of the net profits for the last five months of 1944 and for the calendar years 1945 and 1946. The correctness of the amounts so paid is not in dispute. The plaintiffs, however, claim that there remains owing a substantial amount of money on account of profits in the calendar year 1948 and the first seven months of 1949. The defendant denies that any additional sum is owing, claiming that there were no profits in 1947,

---

1. The 31 plaintiffs owned 19,756 of the 20,148 shares of stock sold. They sued on behalf of themselves and the remaining 14 persons who owned the remaining 392 shares. No issue respecting the propriety of the plaintiffs' so suing on behalf of non-joining sellers has been raised.

1948 and the first seven months of 1949, but only losses.

Both parties are in agreement that there was no profit in the year of 1947 and that nothing is owed for that year. The books of account show for 1947 a net loss of $69,816.96, for 1948 a net loss of $355.54, and for the first seven months of 1949 a net loss of $248,400.43. It is the plaintiffs' position that certain liabilities entered on the books in 1948 and 1949 should have been recorded in 1947 so as to show for 1947 a net loss of $533,020.51,[2] and a net profit before income taxes for 1948 of $193,447.96, and for the first seven months of 1949 of $73,195.99. Plaintiffs allege they are entitled to one-half of these net profits for 1948 and the first seven months of 1949.

Resolution of the differences between the parties is dependent upon the con-struction to be placed upon the terms of the original contract of sale and of the assignment thereof. In pertinent part the original contract of sale provided:

"2. * * * The purchase price for said shares of stock shall be * * *:

"(a) A sum equal to the net worth of Quality as of July 31, 1944 as determined by an audit as herein provided * * *.

"(b) Six (6) payments equivalent to fifty per cent (50%) of the net profits of the business of Quality computed as herein provided for the five years commencing August 1, 1944 and ending July 31, 1949; and * * *

"3. * * *

"(b) The amounts payable under paragraph 2(b) hereof shall be paid by the buyer on March 14, 1945 and

2. The plaintiffs would adjust the entries on the books to show that the following liabilities entered in 1948 or 1949 should have been charged to 1947:

| Item | | 1948 | 1949 |
|---|---|---|---|
| Reserve for losses on amounts receivable under agreement with Quality Appliances, Inc. | | $105,400.00 | $202,684.74 |
| Reserve for losses on hair dryer inventory and deferred hair dryer tool expense | | 47,514.55 | 65,939.00 |
| Adjustment for hair dryer losses included in costs of sales, net | | 33,937.20 | 2,450.22 |
| Legal fees paid | | 8,400.00 | |
| Total liabilities plaintiffs would move back to 1947 | | | $466,325.71 |
| Less interest earned in 1947 but credited to 1948 | $3,122.16 | | |
| Net liability plaintiffs would add to 1947 loss | | | $463,203.55 |
| Loss for 1947 as shown on defendant's books | | | 69,816.96 |
| Loss for 1947 as figured by plaintiffs | | | $533,020.51 |

March 15 of each succeeding year thereafter, the final of said payments to be made March 15, 1950.

\* \* \*

"5. \* \* \*

"The net profits of the business for each of said periods are to be computed on the basis of the methods of accounting now employed by Quality."

In 1946 Chester Bolles, the purchaser of the stock under the original agreement, assigned the contract to the defendant.[3] Thereafter the plaintiffs and the defendant entered into an agreement dated April 11, 1946, which provided that as the remaining portion of the purchase price the defendant should pay to the plaintiffs (paragraph 7(a) thereof):

"An amount equal to fifty percent (50%) of the net profits of the business of Quality computed as provided for in the contract of July 22, 1944, for the years 1946, 1947 and 1948, and the first seven months of 1949."

"Net profits" is a term having a well established meaning. The leading case defining the term is Thomas v. Columbia Phonograph Co., 1911, 144 Wis. 470, 129 N.W. 522, which was a suit by an employee whose compensation was to consist in part of a percentage of net profits. The employer in computing the amount to be paid had offset against losses in prior periods the gains in subsequent periods before making payment for such later periods. The court held this was proper, saying, 129 N.W. at pages 523–524:

" \* \* \* When the words 'net profits' are applied to a course of dealing involving several successive transactions the idea of time is inseparably involved in the expression. For receipts and disbursements, gains and losses, in such case are never simultaneous, and some peri-od is always meant at the end of which net profits may be ascertained. The words 'net profits' unqualified \* \* \* by other words in the contract, would naturally refer to the termination of the adventure. They may also refer to the expiration of a year or other fiscal period, at the end of which profits are to be computed, but which is a fraction of and within the period of adventure. But in this latter case if the business continues and covers several of such fiscal periods, and the period is for the purpose of computation only, and not for the purpose of terminating the adventure, losses and gains arising out of matters covered by an earlier fiscal period but occurring after ascertainment of the profits for that period, are carried into and increase or diminish the net profits in the next or some succeeding fiscal period. \* \* \* It would be an entirely unreasonable construction of this contract to hold that during the period of service the plaintiff might select those months which showed a net profit, compute his percentage on this net profit, and reject all those months which showed a loss. The true construction of this contract is that the fiscal period for computation of net profits is the month, but that the real period to which net profits refers is the period of plaintiff's service and if by reason of net profits made during some months and losses incurred during other months of the period of plaintiff's service, there is at the end no net profit at all, the plaintiff has not earned anything by way of percentages upon net profits. \* \* \* "

Numerous other cases hold that "net profits" cannot be said to exist in any period until the deficits of a prior period have been wiped out. As recently as last year our Court of Appeals so held. In Hamilton Mfg. Co. v. United States,

---

3. The defendant has undergone several changes in corporate name and corporate structure during the period here in-volved, none of which is relevant to the issues of this case.

7 Cir., 1954, 214 F.2d 644, 647, the court said:

" * * * We think it can be said reasonably only that by net profits is meant the net profits upon the business from its organization, and * * are not to be confined to one period and made synonymous with annual profits. * * *

" * * * In the preceding years there were no net profits but only accumulated losses, to the reduction of which current earnings must necessarily be applied until the deficit is wiped out and net profits have actually come into existence."

The court quoted with approval the following language from Lich v. United States Rubber Co., D.C.D.N.J.1941, 39 F.Supp. 675, affirmed per curiam, 3 Cir., 1941, 123 F.2d 145:

" ' * * * The term connotes the clear pecuniary gain remaining after deducting from the gross earnings of the business the expenses incurred in its conduct, the losses sustained in its prosecution, and the capital invested. [Citing cases.] It is a prerequisite to the existence of net profits that the assets of a corporation exceed the liabilities, including the liability on the capital stock. Where the capital is impaired, annual net earnings, if insufficient to offset the impairment, do not constitute net profits. [Citing cases.] The term net profits is not synonymous with the term annual net earnings. Annual net earnings may be productive of net profits, or, as in the instant case, reductive of the deficit.' "

The above definition of "net profits" is peculiarly appropriate in this case. The obvious reason for the provision in the contract of sale of the stock for a payment to the sellers of half the net profits for the next five years in addition to the net worth of the enterprise at the date of the sale as determined by an audit of its books was the recognition by both sellers and the buyer that the net worth as determined from the books did not reflect the full value of the business. In numerous respects the balance sheet of any business, compiled in accordance with current accounting practices, fails to reflect its current value as a going concern. Even when the books of the business, as here, are kept on an accrual basis, the carrying of inventory at cost, regardless of how much higher the market may be, often results in profits fairly attributable to an earlier period appearing only in later transactions. Moreover, the balance sheet usually excludes from book value the conjectural, but nevertheless real, value in the intangibles of a going concern such as the value to be attributed to the existence of an unusual organization of men talented businesswise or engineeringwise, or the manufacture of a particularly timely line of goods. Two businesses having identical book value may have the greatest divergence in revenue production because of the intangibles which accounting normally does not reflect in a balance sheet of net worth. The provision in a contract for a sale of an enterprise at net book value for a division of net profits for a subsequent five year period is a reasonable method of reflecting these intangibles in the sales price.

Because of the foregoing purpose of the provision for the division of net profits it could not be properly held that the plaintiffs may recover the net earnings for 1948 and 1949, where these admittedly were insufficient to offset the losses incurred subsequent to the plaintiffs' receipt of the net profits for 1944, 1945 and 1946. No reason exists for treating each of the six periods for calculating the profits and making periodic payments as separate units so that the losses of one period may be ignored in determining the profits for the subsequent periods. On the contrary, the intent of this contract, to assess fairly the value of the stock sold by plaintiffs and bought by defendant, requires that losses during the five year period be offset against gains without regard to any attempt to fix the annual period within the five year period

during which any loss or gain was incurred. It should be sufficient that all parties agree that the losses occurred during the five year period. Whether plaintiffs are correct in their claim that the losses were incurred in 1947 or the defendant is correct in its claim that the losses were so spread over the three years as to offset in each period the earnings thereof, is not determinative. To hold that plaintiffs were entitled to recover the net annual earnings for 1948 and 1949, assuming they are correct that the losses were incurred in 1947, would be giving them as part of the purchase price a sum over and above the amount fairly agreed upon. In such an event, they would be receiving more than half of the profits for the five year period. At the same time the defendant would have for its part of the bargain obtained a business which did not produce revenues at the rate at which the defendant would be required to pay.

Although the foregoing construction of the contract renders it immaterial whether the defendant properly entered the liabilities reflecting the losses on its books in part in 1947, in part in 1948, and in part in 1949, instead of all in 1947, even on plaintiffs' construction of the contract the plaintiffs offer no plausible basis for recovery.

■ The plaintiffs argue first that under the contract the defendant was a fiduciary and as such has the burden of justifying its accounts. It is true that contracts whereby someone who has full control and possession of books of account of a business undertakes to share profits with one having no access or knowledge of the books, have sometimes been held to create a fiduciary relationship, e. g., Gauthier v. Dickerson, 1952, 41 Wash.2d 419, 249 P.2d 370, 371; Western Union Tel. Co. v. American Bell Tel. Co., 1 Cir., 1903, 125 F. 342, 345. The facts here, however, exclude such a fiduciary relationship.

Throughout the five year period 18 of the plaintiffs were in active operation of the affairs of Quality Hardware. The two largest stockholders, plaintiffs C. A. Laystrom and L. S. Laystrom, brothers, each owning 5,627 shares, were, one or the other, in actual charge of the operations and books of Quality Hardware throughout the five year period.

C. A. Laystrom had been chairman of the board of directors, treasurer and executive officer of Quality Hardware since 1940. He was named in the contract of sale as the agent for the other plaintiffs in all matters arising out of the execution of the contract. He continued in his above named offices until Quality Hardware was dissolved on May 23, 1946, and its operations continued as a division of the defendant. C. A. Laystrom thereafter continued as executive head of the division, bearing the title of general manager and vice-president of the defendant.

When C. A. Laystrom left, his brother Leonard S. Laystrom, who had been employed by Quality Hardware "off and on" since 1915, became general manager of the division and so continued until November 1, 1950.

Plaintiff Hazel Minter, a sister-in-law of C. A. Laystrom, occupied the corporate office of secretary of Quality Hardware until it became a division of the defendant. Thereafter she became assistant treasurer of the defendant. Throughout the period and until 1951 she was in charge of the office, credit and bookkeeping, directing ten to fifteen employees, under the general supervision of Leonard S. Laystrom.

There was never any interference by the defendant in the plaintiffs' operation of the business. All of the business of the Quality Hardware was conducted in Chicago. The other operations of the defendant were elsewhere. No officer or employee of the defendant, other than the plaintiffs, ever spent any time in Chicago in connection with any of the operations of the division, except that Albert L. Smith, a vice-president of defendant, was in Chicago periodically from July 1947 to 1949, for the purposes of operating Quality Appliances, a debtor in bankruptcy proceedings during this

period, which, as hereafter discussed, was heavily indebted to the division. Smith had nothing to do with the operation of the division.

By the admission of plaintiffs during the trial and from all the evidence it is indisputable that at all times here material the plaintiffs actually operated the business which they sold to the defendant, made all decisions, kept the books and were fully conversant with its every detail. The only intervention by the defendant in the affairs of the division was the defendant's directions to Hazel Minter, given after it became manifest that losses were being incurred on the Instant Hair Dryer and the Quality Appliances account, to set up certain reserve accounts on the books, which was done.

From the foregoing facts, it is abundantly clear that the defendant did not stand in a relation of fiduciary to the plaintiffs. But even if a fiduciary relationship did exist, the defendant has met fully the burden of justifying the accounts upon which it relies. While the record may leave some doubt as to whether the plaintiffs concurred in the reserves set up in 1947, there is no contention that at the time they believed that larger liabilities should have been recorded. Neither plaintiffs Leonard S. Laystrom nor Hazel Minter, the two in charge of the books, made entries showing any larger liabilities nor did either suggest to the defendant that the liabilities reflected or reserves set up were too small.

The proper allocation of income and expense for the purpose of fixing for short periods, such as a year, the net profits fairly attributable thereto, depends in many instances upon the judgment of management as to the probabilities of future events rather than any hard and fast rule of accounting. In Dohr, Thompson and Warren, Accounting and the Law (1952), pp. 541–542, it is stated:

"Business enterprises face, at any given time, a wide variety of uncertainties. The necessity of preparing financial statements covering relatively short periods of time, must be dealt with. The uncertainties include such items as risk of loss (fire, storm, accidents and strikes), pending litigation, * * *.

\* \* \* \* \* \*

"The accountant, however, is willing to measure *probabilities*. If, in the face of uncertainty, it is concluded that the probability of loss is sufficiently great, a charge is included in the Income Statement. * * *

"In dealing with contingencies there is a difference in the legal and accounting approaches, particularly in income tax procedure. The cases generally evidence a reluctance to recognize losses until there is convincing evidence that they have been sustained or are unconditional. United States v. S. S. White Dental Manufacturing Co., [274 U.S. 398, 47 S.Ct. 598, 71 L.Ed. 1120] infra p. 546, indicates that the legal concept may go too far in requiring that men be 'incorrigible optimists.' We have seen that generally accepted accounting principles tend toward an earlier recognition of losses; they deal with *probabilities* and recognition is given where the probability of loss is sufficiently great. See A. I.A. Research Bulletin No. 31, infra p. 543. If, on the other hand, it is concluded that the probability is too remote for a revenue deduction to be made, the matter may be dealt with as an appropriation of Retained Income. A note accompanying the financial statements is occasionally used to indicate more remote possibilities of loss.

"The uncertainties in question are frequently referred to as 'contingencies' and while the accountant is concerned with the necessity of considering such possibilities he also realizes that net income may be understated by the inclusion of remote possibilities. An attempt to draw a line between the 'probable' and the

'possible' appears in A.I.A. Research Bulletin No. 28 below. * * * It should be noted that this bulletin was issued prior to A.I.A. Research Bulletin No. 34, suggesting that the use of the term 'reserve' be discontinued."

During the period from 1939 to 1952 the accounting profession itself was engaged in an extensive revision of accounting procedures primarily for the purpose of establishing uniform standards for the accurate reflecting in profit and loss statements of periodic income. From 1939 to 1952 the American Institute of Accountants issued Accounting Research Bulletins Nos. 1–42, which in 1953 were consolidated into its Bulletin No. 43, Restatement and Revision of Accounting Research Bulletins. The purpose of the restatement and revision was expressed as follows (p. 7):

"2. * * * In the past fifty years there has been an increasing use of the corporate system for the purpose of converting into readily transferable form the ownership of large, complex, and more or less permanent business enterprises. This evolution has brought in its train certain uses of the processes of law and accounting which have led to the creation of new controls, revisions of the laws, and reconsideration of accounting procedures.

"3. As a result of this development, the problems in the field of accounting have increasingly come to be considered from the standpoint of the buyer or seller of an interest in an enterprise, with consequent increased recognition of the significance of the income statement and a tendency to restrict narrowly charges and credits to surplus. The fairest possible presentation of periodic net income, with neither material overstatement nor understatement, is important, since the results of operations are significant not only to prospective buyers of an interest in the enterprise but also to prospective sellers. * * *"

In its Bulletin No. 1 (1939) there was a recognition that a revision of accounting practices would lead to a period of diversity and uncertainty:

"* * * One manifestation of it has been a demand for a larger degree of uniformity in accounting, although it may be pointed out that the change of emphasis itself is bound to lead to the adoption of new accounting procedures, so that for a time diversity of practices is likely to be increased as new practices are adopted before old ones have become completely discarded. * * *"

With respect to presenting an income statement for any given year the final Restatement Bulletin No. 43 (1953) states (pp. 59–60, 63):

"3. * * * the income statement is based on the concept of the *going concern*. It is at best an interim report. Profits are not fundamentally the result of operations during any short period of time. Allocations to fiscal periods of both charges and credits affecting the determination of net income are, in part, estimated and conventional and based on assumptions as to future events which may be invalidated by experience. * * *

* * * * * *

"6. The question of what constitutes the most practically useful concept of income for the year is one on which there is much difference of opinion. On the one hand, net income is defined according to a strict proprietary concept by which it is presumed to be determined by the inclusion of all items affecting the net increase in proprietorship during the period except dividend distributions and capital transactions. The form of presentation which gives effect to this broad concept of net income has sometimes been designated the *all-inclusive* income statement. On the other hand, a different concept places its principal emphasis upon relationship of items to the operations, and to the year,

excluding from the determination of net income any material extraordinary items which are not so related or which, if included, would impair the significance of net income so that misleading inferences might be drawn therefrom. This latter concept would require the income statement to be designed on what might be called a *current operating performance* basis, because its chief purpose is to aid those primarily interested in what a company was able to earn under the operating conditions of the period covered by the statement.

\*   \*   \*   \*   \*   \*

"11. \* \* \* *it is the opinion of the committee that there should be a general presumption that all items of profit and loss recognized during the period are to be used in determining the figure reported as net income. The only possible exception to this presumption relates to items which in the aggregate are material in relation to the company's net income and are clearly not identifiable with or do not result from the usual or typical business operations of the* ˙ *period.* \* \* \*"

There are three separate transactions as to which liabilities were reflected in 1948 and 1949 and concerning which plaintiffs claim that all losses should have been reflected in 1947. The first of these involves the Instant Hair Dryer. The record is full of many details respecting contested patent rights, royalties and broken contracts. For the purposes of this opinion it is sufficient to state that in June 1946 Quality Hardware entered into a contract to manufacture a hair dryer for Instant Hair Drying Method, Inc., at the rate of 25,000 machines for each of the first two years and a minimum of 10,000 per year thereafter. Quality Hardware proceeded to manufacture the hair dryer but Instant was able to dispose of only 2,000 machines by the end of 1947 and cancelled its contract. During the fall of 1947 Quality Hard-

ware made certain changes in the hair dryer which it believed would eliminate the resistance to use of the model which Instant had encountered in trying to market it.

The testimony of plaintiff Leonard S. Laystrom, as well as the numerous letters and memoranda written by him over the years of 1947, 1948 and 1949, establish that he at that time believed Quality Hardware would be able to find a market for the hair dryer and that it would prove to be a successful item. Some of the machines were sold to Marshall Field & Co. during 1948 but their operators refused to learn to use the machine. Various negotiations between Leonard S. Laystrom and prospective distributors were carried on during 1948.

In June 1947 defendant realized that Instant was not accepting hair dryers as it had contracted to do. The Quality Appliances had defaulted on its accounts in May 1947. Because of the possibility of substantial losses arising therefrom, defendant directed Hazel Minter to set up a reserve of $15,000 at the end of July 1947 on the books of Quality Hardware to serve as a contingent liability reflecting possible losses on these two items and to increase this reserve each month by the amount of monthly profits of the division on other items. As of November 30, 1947, this reserve had accumulated in the amount of $87,500. At the end of 1947, upon instruction from the defendant, this reserve was increased by the amount of $12,500, making a total reserve of $100,-000. Thereafter in 1948 and 1949, upon the defendant's direction, the practice of setting up on the books of Quality Hardware of monthly reserves equal to monthly profits was continued.

Plaintiffs contend that the inventory for the hair dryer which stood at $198,839 on the books of the division at the end of 1947 should at that time have been written off completely, less scrap value. There is no doubt that it is correct accounting practice to so write

off inventory carried at cost if a loss has clearly been sustained. The Restatement Bulletin expresses the applicable accounting procedure as follows (Bulletin No. 43, pp. 30–31):

"A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as *market.*

\* \* \* \*

"9. The rule of *cost or market, whichever is lower* is intended to provide a means of measuring the residual usefulness of an inventory expenditure. \* \* \* In applying the rule, however, judgment must always be exercised and no loss should be recognized unless the evidence indicates clearly that a loss has been sustained. \* \* \*"

Whether a loss has in fact been sustained necessarily turns upon the facts of each case. Thus, in Becker v. Anheuser-Busch, Inc., 8 Cir., 1941, 120 F.2d 403, certiorari denied 314 U.S. 625, 62 S.Ct. 105, 86 L.Ed. 105, the fact that the advent of Prohibition had rendered almost useless several million beer bottles was held not to justify their writing off as a loss when the taxpayer was continuing to sell some and was experimenting with their suitability for sales of soft drink or medicinal purposes. Cf. Grays Harbor Motorship Corp. v. United States, 1930, 45 F.2d 259, 279–280, 71 Ct.Cl. 167.

The record is convincing that neither the plaintiffs nor the defendant regarded the Instant Hair Dryer as a loss in 1947. Indeed, on August 25, 1950, C. A. Lay-strom, as agent for the sellers, wrote defendant complaining that no losses on the hair dryer should have been written off in 1947 "as the hair dryer is now being sold." In this letter he requested that the defendant have a new audit for 1947 "eliminating the losses on the hair dryer." This letter was not an isolated expression of attitude. Both by his testimony on the witness stand and by numerous written documents over his signature, Leonard S. Laystrom established that throughout 1947, 1948 and well into 1949, the plaintiffs had faith in their hair dryer and believed they could sell it. They continued throughout the period to negotiate for sales of the dryer and did make improvements and some sales subsequent to 1947.

This was true also with respect to the Quality Appliances accounts. These arose from contracts entered into on December 3, 1946, whereby Quality Hardware sold a portion of its business, including land, buildings, equipment and inventory, to Quality Appliances for a total purchase price of $710,000. The title to the inventory at all times remained in Quality Hardware. The record is convincing that neither the plaintiffs nor the defendant regarded the accounts as a substantial loss in 1947 even though at that time Quality Appliances, Inc., instituted proceedings under Chapter XI of the Bankruptcy Act and secured court approval of an arrangement for creditors. In 1948 the defendant advanced very substantial sums of money on creditor's certificates in the belief it could still effectuate a substantial recoupment in the Quality Appliances accounts.

As to both the hair dryer and the Quality Appliances situation, it cannot be fairly found that either the plaintiffs or the defendant in 1947 should reasonably have foreseen a greater loss than was reflected on the books for that year. The continued expenditures of time and money on both enterprises demonstrate the good faith of the defendant's belief in their continued worth. Cf. Rassieur v. Commissioner, 8 Cir., 1942, 129 F.2d 820, 825–826; Smith v. Helvering, 1944,

**140**

78 U.S.App.D.C. 342, 141 F.2d 529; Italian Mosaic & Marble Co. v. Commissioner, 2 Cir., 1942, 132 F.2d 793, 794; Lacy v. United States, D.C.N.D.Ill.1952, 105 F.Supp. 601; Lovelace v. United States, D.C.S.D.Ill.1943, 53 F.Supp. 158, 161; Foley v. Reynolds, D.C.D.Minn.1944, 58 F.Supp. 228, 230–231; Bancroft v. United States, 1940, 33 F.Supp. 225, 234, 91 Ct.Cl. 511.

█ The plaintiffs claim that certain legal fees entered on the books as liabilities in 1948 should have been entered in 1947. Admittedly the services were performed in 1947 but both the fee and its amount was uncertain until court approval which was not given until 1948. This liability was properly recorded in 1948. Cf. Security Flour Mills Co. v. Commissioner, 1943, 321 U.S. 281, 284, 64 S.Ct. 596, 88 L.Ed. 725; Commissioner v. Blaine, Mackay, Lee Co., 3 Cir., 1943, 141 F.2d 201, 203; Kanne v. American Factors, 9 Cir., 1951, 190 F.2d 155, 160–161; Old Colony Trust Associates v. Hassett, D.C.D.Mass.1944, 55 F.Supp. 629, 630, reversed on other grounds, 1 Cir., 1945, 150 F.2d 179.

█ The manner in which the amount of the reserves set up in 1947, 1948 and 1949 was determined is not today approved accounting practice. When it became apparent in the summer of 1947 that substantial losses might be incurred on the hair dryer and the Quality Appliances account, the defendant instructed Hazel Minter to set up a reserve each month equal to profits made on other items. This was admittedly done in order to avoid paying the various officers and employees of the division a bonus based on net profits. This manner of entering the reserves in the books protected defendant from having to pay out shares of net profits when there were no net profits but saved it the embarrassment of taking a huge loss which might never materialize. During the 1940's the problem of setting up such reserves was being hotly debated in accounting circles. See Samuel J. Broad, Recent Efforts to Increase Significance of the Figure of Net Income, 89 Journal of Accounting 376 (1950). The conclusion was that such reserves should not be set up to equalize income and no liability against income should be recorded unless a loss was actually sustained and then only in the amount of the loss. Accounting Research Bulletin No. 43, pp. 41–42, points out:

"4. The committee recognizes the character of the income statement as a tentative instalment in the record of long-time financial results, and is aware of the tendency to exaggerate the significance of the net income for a single year. Nevertheless, there still exist the responsibility for determining net income as fairly as possible by sound methods consistently applied and the duty to show it clearly. In accomplishing these objectives, it is deemed desirable to provide, by charges in the current income statement, properly classified, for all foreseeable costs and losses applicable against current revenues, to the extent that they can be measured and allocated to fiscal periods with reasonable approximation.

"5. Accordingly, inventories on hand or contracted for should be priced in accordance with principles stated elsewhere by the committee. When inventories which have been priced in accordance with those principles are further written down by a charge to income, either directly or through the use of a reserve, current revenues are not properly matched with applicable costs, and charges to future operations are correspondingly reduced. This process results in the shifting of profits from one period to another in violation of the principle that reserves should not be used for the purpose of equalizing reported income.

\* \* \* \* \* \*

"7. The committee is therefore of the opinion that reserves such as those created:

"(a) for general undetermined contingencies, or

"(b) for any indefinite possible future losses, such as, for example, losses on inventories not on hand or contracted for, or

"(c) for the purpose of reducing inventories other than to a basis which is in accordance with generally accepted accounting principles, or

"(d) without regard to any specific loss reasonably related to the operations of the current period, or

"(e) in amounts not determined on the basis of any reasonable estimates of costs or losses

are of such a nature that charges or credits relating to such reserves should not enter into the determination of net income."

Similarly, see Reserves and Retained Income, Supplementary Statement No. 1, Committee on Concepts and Standards Underlying Corporate Financial Statements, American Accounting Association (December, 1950):

"The literature of the accounting profession contains numerous attacks on the use in accounting of the word 'reserve'. In 1949 the Committee on Concepts and Standards considered this problem and recommended that the use of the term 'reserve' be limited to reserves which constitute a part of the stockholders' equity.

\* \* \* \* \* \*

"Amounts established to 'provide' for anticipated shrinkages in asset values (such as future inventory losses, or other losses which if they do occur are clearly related to future, not current, operations) are not proper deduction-from-asset items. Such anticipated losses preferably are disclosed in footnotes to the statements. If management has elected to provide for them by appropriations of retained income, such appropriations should be classified as retained income on published statements. Similar conclusions are applicable to conjectural past or present losses (when it is not established by reasonably objective evidence that any loss has been incurred)."

The very existence of this debate shows that the accounting practice here followed was not at the time generally regarded as improper. Cf. Koppel v. Middle States Petroleum Corp., 1950, 197 Misc. 479, 96 N.Y.S.2d 38, 42–43, affirmed per curiam, 282 App.Div. 662, 122 N.Y.S.2d 802 (A.D.1953). Both because the plaintiffs do not complain that the liabilities so entered in 1947 were larger than proper—but the contrary—and because the entries followed acceptable accounting practice at that time, plaintiffs show no basis therein for recovery.

■ The plaintiffs allege that defendant breached its contractual obligation to provide plaintiffs with an annual audit of the books on March 15th of each year. The defendant did furnish plaintiffs with reports of certified public accountants reviewing the financial statements of the division for each year. The plaintiffs contend that these reports are not "audits" within the meaning of the contract because the certificate of the accountant contained various reservations and qualifications. These reservations and qualifications consisted of statements of the accountant pointing out the uncertainties involved in the entries pertaining to the Instant Hair Dryer and Quality Appliances, Inc. Such qualifications are proper in an audit. In American Institute of Accountants, Generally Accepted Auditing Standards (1954), pp. 14, 45–46, the elements of an audit are stated as follows:

"1. The report shall state whether the financial statements are presented in accordance with generally accepted principles of accounting.

"2. The report shall state whether such principles have been consistently observed in the current period in relation to the preceding period.

"3. Informative disclosures in the financial statements are to be

regarded as reasonably adequate unless otherwise stated in the report.

"4. The report shall either contain an expression of opinion regarding the financial statements, taken as a whole, or an assertion to the effect that an opinion cannot be expressed. When an over-all opinion cannot be expressed, the reasons therefor should be stated. \* \* "

In American Institute of Accountants, Accounting Research Bulletin No. 43 (1953), p. 10, it is stated:

" \* \* \* The responsibility of the auditor is to express his opinion concerning the financial statements and to state clearly such explanations, amplifications, disagreements, or disapproval as he deems appropriate. \* \* \* "

In Shugerman, Abe L., Accounting for Lawyers (1952), p. 9, it is stated:

"The auditor is an expert at verifying the accuracy of the recordation process. Strictly speaking, he is neither a financial statement analyst nor is he concerned with the summarization aspect of accounting."

Accordingly, the qualifications and reservations contained in the reports did not disqualify them as audits. Indeed, the fact that the Securities and Exchange Commission approved of the issuance by the defendant of registration statements in which the uncertainties inherent in the Instant Hair Dryer and the Quality Hardware account were reflected solely by way of comment and qualifications rather than as entries of losses sustained on the financial statements, is strong confirmation of the propriety of the audits in this regard. This is especially true in a situation such as we are confronted with in this case, where the plaintiffs were in complete charge of keeping the relevant books of account and as a consequence they could not possibly have been harmed by the statements of the qualifications and reservations.

There will be a finding of the issues in favor of the defendant and against the plaintiffs. The findings of fact and conclusions of law hereinabove set forth will be considered the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Judgment will be entered for the defendant with costs against the plaintiffs.