## GLUCK et al. v. COMMERCIAL MERCHANTS NAT. BANK & TRUST CO. OF PEORIA et al.

### No. P–1079.

United States District Court
S. D. Illinois, N. D.

Aug. 30, 1949.

Clarence W. Heyl, Heyl, Royster & Voelker, Peoria, Illinois, Rothbart & Rosenfield, Chicago, Illinois, for plaintiffs.

E. D. McLaughlin, Hunter, Kavanagh, McLaughlin & Bond, Peoria, Illinois, for defendants.

BRIGGLE, Chief Judge.

On August 14th, 1935, the individual plaintiffs entered into a lease with the defendant bank as lessor for the premises known as 217-219 South Adams Street, Peoria, Illinois, for a period of 15 years.

Subsequently the individual plaintiffs assigned their right in the lease to the corporate plaintiff and the defendant bank assigned all its right to the defendant Salzenstein Building Corporation. Each assignee assumed the obligations of the respective assignors.

Plaintiffs in this proceeding seek a declaratory judgment interpreting the provisions of said lease and defining the rights of the parties. Defendants answered admitting the material facts and at the hearing it was agreed by the parties that no controverted question of fact existed but that the case turned purely on a question of law to be determined by the Court from the lease itself, together with an amendment thereto of January 11, 1939, and the conceded facts.

The controversy arises over the construction to be given certain provisions of clause 3 of the lease.* Plaintiffs contend that under this clause they are obligated to pay as rent for the entire term of the lease the minimum sum of $202,000, plus only such further sum of 5% of the gross sales as may for the *entire* term exceed the minimum guaranteed amount; that having now paid in excess of $202,000 they are not obligated to pay any further sums for the remainder of the leasing period except and until 5% of their gross sales exceed $202,000. Defendants assert on the other hand that plaintiffs were required to compute 5% of the gross sales at each 6 months period of the lease and for those periods where 5% of gross sales exceeded the minimum monthly payments made for the same period, to pay without restriction or condition such overplus to defendants. This without regard to whether such payments would at the end of the leasing period amount to more than they otherwise would if the leasing term were considered as a whole.

Plaintiffs have at all times met the monthly payments required by Clause III, and have rendered an account to defendants at each 6 months period of their gross sales for such period. Under this accounting, nothing over and above the monthly payments became due defendants until 1944. At this time and at all subsequent semi-annual periods 5% of the plaintiffs' gross sales amounted to more than the minimum monthly payments for six months. These additional payments were made by plaintiffs under protest and they now claim that if their theory of the contract is correct they are entitled to a readjustment of the amounts so paid. They urge that they are entitled to spread the 5% of gross sales now being earned back over the lean years prior to 1944 and thus equalize the 5% of gross sales over the entire period of the lease.

The problem is one of ascertaining, if possible, the intention of the parties. There is a dearth of authority on the subject and such as there is must be scru-

---

* III.

In consideration of the leasing of the premises aforesaid, the tenant covenants and agrees to pay to the landlord as rent for the demised premises a sum equal to five (5%) percent of the gross sales during the entire period of this lease, with the guarantee that the aggregate minimum payment for the term of the lease shall be not less than Two Hundred Two Thousand ($202,000.00) Dollars.

Such guaranteed minimum shall be paid as follows:

One Thousand ($1,000.00) Dollars on the fifteenth day of October, 1935, and on the fifteenth day of each month thereafter, in advance, during the first five years of the term.

Eleven Hundred Twenty Five ($1,125.00) Dollars on the fifteenth day of each month, in advance, during the second five years of the term.

Twelve Hundred Fifty ($1,250.00) Dollars on the fifteenth day of each month, in advance, during the third five years of the term.

The balance over and above the minimum guaranteed rental on the basis of five (5) percent of gross sales shall be paid to the landlord within thirty (30) days after the end of each six (6) months period; that is, from October 15th to April 15th and from April 15th to October 15th. If such sales, for any one (1) period of six months, based upon five (5) percent of the gross sales for that period, show in excess of the guaranteed minimum rental to be paid hereunder, the tenant is to pay to the landlord such additional amount as additional rental for that period, same to be payable within thirty (30) days from the expiration of each six months period. * * *

tinized with care lest the Court be lead astray by seemingly similar facts, which on analysis are found to sufficiently differ as to point to the opposite conclusion. I have examined with considerable interest the cases referred to in the briefs and thought by counsel to support the contentions of the respective parties. Those cited by plaintiffs—Arcade Realty Holding Corp. v. Hildinger, 144 A. 25, 6 N.J.Misc. 1055; City Hotel Co. v. Aumont Hotel Co., Tex.Civ.App., 107 S.W.2d 1094, and those cited by defendants—Hamden Holding Corp. v. United Men's Shop, 127 Conn. 500, 18 A.2d 356; Carlson v. D. A. Schulte, Inc., 124 Misc. 880, 209 N.Y.S. 631, and Grosse v. Barman, 9 Cal.App. 650, 100 P. 348, have been studied with an effort to learn the precise facts upon which those decisions rested. After all the persuasiveness or lack of persuasiveness of a decision is to be measured by the facts that brought it about. Without entering into a discussion of the separate cases cited or undertaking to analyze the conclusions there reached by the various Courts it is sufficient to say that each of those decisions was an effort to spell out the intent of the contracting parties under the facts then before the Courts. This opinion has a like purpose, and I am convinced that the conclusion I have reached in interpreting the lease in question does not seriously clash with any of those decisions.

The first paragraph of Clause III of the lease, read alone, tends to support the interpretation urged by plaintiffs. There is nothing in this paragraph, however, indicating how or when the 5% gross income is to be computed or paid. Obviously it could not be definitely determined what 5% of the gross income for the period of the lease would be until the expiration date and it might be urged, if no other language appeared, that nothing was to be paid in the way of rent until the end of the 15 year period. The parties, however, took care of what would otherwise have been an incongruous situation by subsequent language in Clause III wherein the guaranteed amount of $202,000 for the period of the lease was subdivided into monthly payments and required to be thus paid. They also provided for the 5% of gross sales to be computed

at the close of each 6 months period, and if this produced an overplus for such period above the guaranteed monthly payments it was to be paid in 30 days. They said specifically:

"If such sales, for any one (1) period of six months, based upon five (5) percent of the gross sales for that period, show in excess of the guaranteed minimum rental to be paid hereunder, the tenant is to pay to the landlord such additional amount as additional rental for that period, same to be payable within thirty (30) days from the expiration of each six months period."

This language, I think, indicates finality with respect to such 6 months periods and that it was not within the contemplation of the parties that the lessor might at sometime in the future be called upon to return part or all of such payments to the lessee. The interpretation urged by plaintiffs would require a readjustment of accounts at the end of the term and the possible refunding to the lessee of some of the semi-annual payments. This, I think, cannot be reasonably said to have been within the contemplation of the parties at the time of entering into the lease.

The modification of the lease on January 31, 1939, is also important. The language in the last paragraph of this modification wherein the parties say "Item III. of said lease also provides that the tenants shall pay an additional rental over the guarantee minimum rental fixed by the lease on the basis of five percent (5%) on gross sales during each six months period, and fixes such six months period as from October 15th to April 15th and from April 15th to October 15th of each year. The tenant finds it inconvenient to make reports of sales for periods ending on the 15th of any month, and at tenants request it is agreed that the current six months period shall be shortened so as to end April 1st 1939, and that thereafter such six months period shall extend from April 1st to October 1st and from October 1st to April 1st, otherwise the terms of said lease are not altered or amended" cannot be disregarded. The parties there tell us what they meant in the original lease when they say that the lease

provided that tenants should pay an additional rental, over the guaranteed minimum, of 5% on gross sales *during each six months period*. By their modification they changed the period to the 1st of the month instead of the 15th, because it was not convenient to make reports of sales in the middle of the month. This change is of no significance but the language thus used by the parties is significant and points to the conclusion that the 5% of gross sales was intended to be computed and adjusted with finality every 6 months. Contemporaneous practical construction by the parties is persuasive of their intention.

The basic fundamental "rent" was 5% of the gross sales, subject to a minimum guaranteed amount. Against that the tenant was to pay so much per month, which aggregated the guaranteed rental. Since neither party could possibly know in advance what the gross sales would be or what 5% thereof would be, there necessarily had to be some provision for figuring and accounting as to that after the event,—that is, after the sales were made. Theoretically, I presume they could have provided that the accounting should not occur until the end of the term,—or they could have provided for it monthly, or at any other given period. It seems, however, that they did provide that it be made semi-annually.

These, and other clauses of the lease, I think, negative the idea that it was the purpose of the parties to readjust the monthly as well as the semi-annual payments to meet an overall limit of 5% on aggregate sales for the entire period. It is my view that the parties intended the monthly payments throughout the lease, plus the semi-annual payments as required, to be made at the times indicated with finality and without regard to the total amount of rent that might be thus produced for the entire term. The language of a later paragraph of Clause III wherein the tenant covenants "that for the purpose of ascertaining the amount payable as additional rent for any six months * * * it will keep * * * books which shall show daily sales made by the tenant * * *" lends support to this view. The language

of the first paragraph of Clause III fixing the rental at 5% of gross sales "during the entire period of the lease" should be construed to mean that the rental of 5% of gross sales is to remain constant throughout the term of the lease. So construed, the subsequent provisions of Clause III are harmonious and the parties have not spoken ambiguously.

Findings of fact, conclusions of law and a decree construing the lease as herein indicated may be presented.