**UNITED STATES of America**

v.

**MOORE–McCORMACK LINES, INC.**

and

**Indemnity Insurance Company of North America.**

Admiralty No. 4276.

United States District Court
D. Maryland.

Nov. 16, 1961.

Supplemental Opinion Dec. 22, 1961.

Joseph D. Tydings, U. S. Atty., Baltimore, Md., Leavenworth Colby and Lawrence F. Ledebur, Attys., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C. (Lawrence F. Ledebur, Washington, D. C., of counsel), for libelant.

Ober, Williams, Grimes & Stinson, Baltimore, Md., and Kominers & Fort, Washington, D. C. (J. Franklin Fort, Washington, D. C., of counsel), for respondents.

THOMSEN, Chief Judge.

This is a suit by the United States to recover from respondent Moore-McCormack Lines, Inc., and its surety "additional charter hire" alleged to be due the government under a bareboat charter of three government vessels.

The first two causes of action seek a judgment (1) declaring the rights and obligations of the parties with respect to the payment of additional charter hire under sec. 709(a) of the Merchant Marine Act, 1936, 46 U.S.C.A. § 1199(a), and Clause 6 of Charter Contract No. MA–153, and (2) directing respondents to pay to the government as such additional charter hire $278,069.30 for the year 1951 and $314,019.14 for the year 1952, a total of $592,088.44, plus interest.

A third, alternative cause of action seeks recovery of $296,044.22, plus interest, the amount agreed by the parties to be due the government for reimbursement of operating differential subsidy payments if the government is not entitled to recover the amounts claimed for additional charter hire.

There is no dispute about any material fact, and each side has filed a motion for summary judgment, as permitted by Admiralty Rule 58, 28 U.S.C.A., recently adopted by the Supreme Court. The motions are for partial summary judgment only, since a fourth cause of action claims damages for inventory shortages which are disputed.

The Merchant Marine Act, 1936 (The Act), 49 Stat. 1985, 46 U.S.C.A. §§ 1101–1294, contains twelve subchapters. Subchapter VI, sec. 601 et seq., is titled "Operating-Differential Subsidy". It includes the operation of vessels chartered by the carrier as well as vessels owned by the carrier. Subchapter VII, sec. 701 et seq., is titled "Private Charter Operation". Although the several subchapters deal with the same general subject—aid to the American Merchant Marine—they contain distinct provisions.

Sec. 709(a) of the Act, 46 U.S.C.A. § 1199(a), a part of the subchapter dealing with private charter operations, required the government[1] to collect additional charter hire as follows:

"(a) Every charter made by the Commission pursuant to the provisions of this title shall provide that whenever, at the end of any calendar year subsequent to the execution of such charter, the cumulative net voyage profits (after payment of the charter hire reserved in the charter and payment of the charterer's fair and reasonable overhead expenses applicable to operation of the chartered vessels) shall exceed 10 per centum per annum on the charterer's capital necessarily employed in the business of such chartered vessels, the charterer shall pay over to the Commission, as additional charter hire, one-half of such cumulative net voyage profit in excess of 10 per centum per annum: Provided, That the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years."

The charter (No. MA–153) required Moore-McCormack to pay to the government a fixed monthly rental, called "basic charter hire", and, if the chartering were sufficiently profitable, to pay at the end of each calendar year a further, profit-sharing rental, called "additional charter hire". Clause 6 of the charter, dealing with additional charter hire, set out under "Facts" below, was based upon sec. 709(a).

The principal issue presented by the motions for partial summary judgment is whether sec. 709(a) requires that the additional charter hire be computed and paid separately for each calendar year, or

---

1. The Maritime Commission was abolished on May 24, 1950, by sec. 306, Reorganization Plan No. 21 of 1950, 64 Stat. 1277, as set forth in a note following 46 U.S. C.A. § 1111. The Plan concurrently created the Federal Maritime Board and established within the Department of Commerce the Maritime Administration, which acts by and through the Maritime Administrator. It was the Maritime Administration, as successor to the Commission, which negotiated the charter involved in this suit. The several agencies will be referred to collectively herein as "Maritime". The statute is quoted as it existed at that time. By an amendment adopted in 1952 "Secretary of Commerce" was substituted for "Commission" in the first line of sec. 709(a).

whether the additional charter hire may be averaged over the life of the charter.

The government contends that the statute and the charter require that additional charter hire be calculated separately upon each calendar year's "cumulative net voyage profits", and that a second cumulation or averaging over the years is neither required nor permitted. Moore-McCormack contends that it is entitled to average the profit-sharing rental over the whole life of the charter by carrying forward the cumulative net voyage profits from each of the calendar years 1951 and 1952 and offsetting such profits against the losses sustained in subsequent calendar years.

The government also contends that Moore-McCormack is estopped to deny the validity of the government's position, by reason of Moore-McCormack's acts and failure to act over a long period of years, including the entire period of the charter.

### Facts.

On April 18, 1951, Maritime issued an invitation for competitive bids for the charter of the "Good Neighbor Fleet", consisting of the vessels S.S. Uruguay, S.S. Argentina and S.S. Brazil. Moore-McCormack replied to the invitation on June 1, 1951. Its bid was accepted, and Moore-McCormack and Maritime entered into Charter Party Agreement No. MA–153.[2] Clause 5 of the Charter provided that Moore-McCormack would pay to Maritime a fixed primary monthly rental or "basic charter hire" of $22,000 per month for each of the chartered vessels. Clause 6 provided for "additional charter hire", as follows:

"(a) If at the end of the calendar year 1951, or any subsequent calendar year or at the termination of this Agreement, the cumulative net voyage profit (after the payment of the basic charter hire hereinabove specified and payment of the Charterer's fair and reasonable overhead expenses applicable to operation of the Vessels) shall exceed 10 per centum per annum on the Charterer's capital necessarily employed in the business of the Vessels (all as hereinafter defined), the Charterer shall pay over to the Owner at Washington, D. C., within thirty (30) days after the end of such year or other period, as additional charter hire for such year or other period, an amount equal to one-half of such cumulative net voyage profit in excess of 10 per centum per annum of the Charterer's capital necessarily employed in the business of the Vessels but such cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in any subsequent year or period.

"(b) The Charterer agrees to make preliminary payments to the Owner on account of such additional charter hire at such times and in such manner and amounts as may be required by the Owner; *provided* however, that such payment of additional charter hire shall be deemed to be preliminary and subject to adjustment either at the time of the rendition of preliminary statements or upon the completion of each final audit by the Owner, at which times such payments will be made to the Owner as such preliminary statements or final audit may show to be due, or such overpayments refunded to the Charterer as may be required."

The charter was initially for a period of three years, subject to extension for additional periods by mutual agreement. It was extended for two of the vessels. Moore-McCormack also agreed to construct new and more modern vessels to replace the chartered vessels at a later

**2.** Thereafter, on August 14, 1951, Moore-McCormack (as principal) and respondent Indemnity Insurance Company of North America (as surety) executed their joint and several bonds in the penal sum of $250,000 for the purpose of insuring performance of Moore-McCormack's obligations under the charter, including, specifically, performance of the obligation to pay charter hire.

date. That agreement was covered by other provisions of the Act.

Following the execution of the charter agreement, Maritime delivered the three chartered vessels to Moore-McCormack on various dates in July and August 1951. Moore-McCormack thereafter operated the Uruguay until April 27, 1954, the Brazil until December 27, 1957, and the Argentina until August 22, 1958, on which dates the respective vessels were redelivered to Maritime.

Moore-McCormack's cumulative net voyage profit from operations under the charter during calendar year 1951 after deducting the "allowable return"[3] was $556,138.59. The similar figure for the year 1952 was $628,038.27. However, Moore-McCormack sustained losses in each of the succeeding calendar years 1953 through 1957.

At all pertinent times, Moore-McCormack was subsidized by Maritime under Title VI of the Act, 46 U.S.C.A. § 1171 et seq., and had an "Operating Differential Subsidy Agreement" with Maritime, designated as Contract MCc–62436. By an appropriate amendment to that contract, Moore-McCormack's operation of the chartered "Good Neighbor Fleet" was subsidized.

Moore-McCormack submitted annual combined accountings under its subsidy agreement No. MCc–62436 and its charter agreement No. MA–153. Those accountings determined not only whether any additional charter hire was due under sec. 709(a), but also the total amount of subsidy to be paid to Moore-McCormack under its subsidy agreements and the amount of subsidy to be "recaptured" by Maritime.[4] In those accountings Moore-McCormack deducted as an expense the additional charter hire for which the government now sues.[5] In computing the additional charter hire, Moore-McCormack did not attempt to combine its cumulative net voyage profits in calendar year 1951 with its cumulative net voyage profits in calendar year 1952, and did not attempt to offset such cumulative net voyage profits (either separately or combined for the two years) against losses sustained in the subsequent calendar years 1953–1957 (so as to average the profits over the whole life of the contract). On the contrary, Moore-McCormack at all times accounted for cumulative net voyage profits (or losses) from its operations under Charter MA–153 on a separate calendar year basis, cumulating only the results of the several voyages conducted within a single calendar year,

3. Moore-McCormack's separate annual accountings for the calendar years 1951 through 1956, as audited and approved by Maritime Administration may be summarized as follows:

| Year | Cumulative Net Voyage Profit or (Loss) | Allowable Return (10%) of Charterer's Capital Investment | Excess Profit | One-Half Excess Profit |
|------|------|------|------|------|
| 1951 | $609,236.25 | $ 53,097.66 | $556,138.59 | $278,069.30 |
| 1952 | 760,193.77 | 132,155.50 | 628,038.27 | 314,019.14 |
| 1953 | (2,066,962.82) | | | |
| 1954 | (1,460,665.79) | | | |
| 1955 | (1,283,257.12) | | | |
| 1956 | (1,303,747.35) | | | |
| 1957 | (1,231,105.74) | (unaudited) | | |

4. See sec. 606(5) of the Act, 46 U.S.C.A. § 1176(5).

5. As noted above, respondents admit their liability for the government's alternative claim for "recapture" of $296,044.22 "subsidy" (third cause of action herein), if Moore-McCormack is held not liable for the $592,088.44 claimed by the government as "additional charter hire".

526

without claiming the right to combine or average the cumulative results of successive years. It is true that this form of accounting was required by Maritime, but Moore-McCormack made no objection with respect thereto in connection with these vessels until after the charter had terminated and it had redelivered all the chartered vessels to the government.[6]

Because of the complexities of the accounting and the fact that many items could not be finally determined until long after the expiration of the respective calendar years, Maritime did not bill Moore-McCormack for the additional charter hire under Charter MA–153 for any year until November 28, 1958. On that date, pursuant to final accounting and audit, Maritime billed Moore-McCormack for $278,069.30 additional charter hire for charter operations during calendar year 1951.[7] On January 14, 1959, Moore-McCormack was similarly billed, pursuant to final accounting and audit, for $314,019.14 additional charter hire for charter operations during the calendar year 1952.[8] Moore-McCormack did not pay these invoices. Instead, on February 17, 1959, when submitting a fifth and final accounting for the year 1953, it wrote to Maritime, argued for the first time that it was not liable for additional charter hire for either 1951 or 1952, and asserted the right to offset its 1953 losses against its 1951–1952 profits. Maritime rejected that contention. Efforts to have the matter settled in earlier litigation proved futile.

The question presented in this case is also presented in other cases pending throughout the country, often complicated by additional charter provisions which alter the problem. See e. g. the series of cases reported sub nom. American-Foreign Steamship Corp. v. United States, discussed below.

### Discussion

#### A.

Under the provisions of its subsidy agreement and in accordance with industry practice, respondent was required to maintain records which would show the financial results for each terminated voyage.[9]

Sec. 709(a) of the Act, 46 U.S.C.A. § 1199(a), quoted above, calls for a cumulation of the results of all the terminated voyages of the several vessels under a particular charter within the period of a single calendar year. For example, at the end of the year 1951, Moore-McCormack was required to cumulate the net voyage profits from all voyages terminated during that year, and to pay to the government "as additional charter hire" one-half of the amount by which such cumulative net voyage profits exceeded the return specified in the statute, after payment of the charter hire reserved in the charter and the charterer's fair and reasonable overhead expenses. A similar accounting and payment were required at the end of each calendar year during the period of the charter.[10]

There is nothing contingent about the obligation to pay imposed by sec. 709(a), nothing which suggests that there might be a refund or an offset as a result of possible losses in future years.

■ The provisions of subchapter VII of the Act, 46 U.S.C.A. § 1191 et seq., were intended to provide for (1) an agreed monthly rental or charter hire,

---

6. In 1957 Moore-McCormack had made such an objection in connection with another charter. Other carriers had made similar objections.

7. This sum represents one-half of the charterer's excess "cumulative net voyage profit" for the calendar year 1951. See computation, note 3, supra.

8. This sum represents one-half of the charterer's excess "cumulative net voyage profit" for the calendar year 1952.

9. General Order 22, as revised, 15 Fed. Reg. 4935.

10. Clause 6(a) of the charter states specifically that such payment shall be made "as additional charter hire for such year" and that the payment shall be made within thirty days after the end of the year. Clause 6(b) provided for preliminary payments on account, subject to adjustment upon the completion of each final audit.

and (2) additional charter hire in years of unusually profitable operation.[11] "The obvious purpose of the statutory requirement that charters shall contain a provision for the payment of this 'additional charter hire' is to cut down the excessive profits payable in case the 'charter hire reserved in the charter' has been fixed too low." Dichman, Wright & Pugh, Inc. v. United States, S.D.N.Y., 144 F.Supp. 922, 924, Dimock, J. Congress evidently intended that such additional charter hire should be calculated and paid on a year to year basis, and that any averaging of yearly results should be provided for in the subsidy agreements authorized by subchapter VI of the Act, of which Moore-McCormack has had the benefit. The provisions of subchapter VII, including sec. 709(a), were not intended to guarantee a profit or to provide a subsidy to the charterers.

■ If there were any doubt about the meaning of the statute, it would be dispelled by the proviso at the end of sec. 709(a), which specifically provides that "the cumulative net profit so accounted for shall not be included in any calculation of cumulative net profit in subsequent years".

Respondents argue that the proviso is superfluous if the body of the section is given the construction urged by the government; that the proviso was intended merely to prohibit the pyramiding of profits; and that it prohibits only the carrying forward of profits into later profit years, not the carrying forward of profits into later loss years. The last part of respondents' argument overlooks the fact that the proviso deals with the "calculation" of cumulative net profit in future years; those calculations may result in a profit or a loss depending upon the experience. The proviso certainly prohibits the pyramiding of profits; but that is not its only effect. It also emphasizes the intention of Congress that in determining whether any additional charter hire is payable, and the amount

thereof, the calculation shall be made on an annual basis.

When Congress desired cumulation to extend beyond a single calendar year, it expressly so provided. For example, sec. 505(b) of the Act, 46 U.S.C.A. § 1155(b), dealing with construction contracts, states: " * * * if there is a net loss on all such contracts * * * within any income taxable year, such net loss shall be allowed as a credit in determining the excess profit, if any, for the next succeeding income taxable year: * * *."

Sec. 606(5), 46 U.S.C.A. § 1176(5), dealing with the recapture of subsidy payments, provides for payment to the government of one-half of the carrier's net profits over a ten-year period, insofar as such profit "during such period * * * has averaged more than 10 per centum * * * upon the contractor's capital investment * * * ".

Sec. 607(b), 46 U.S.C.A. § 1177(b), provides that the Commission shall not require a subsidized operator capital reserve fund "unless the cumulative net profits of the contractor, at the time such deposit is to be made, shall be in excess of 10 per centum per annum from the date the contract was executed".

The ten-year "averaging" provision was added to sec. 606(5) in 1938, but Congress included no similar provision for averaging in sec. 709(a), 46 U.S.C.A. § 1199(a), with which we are concerned in this case.

Both sides have cited the legislative history of these and other provisions of the Merchant Marine Act and of various bills which did not pass, but such history offers no guide to the construction of sec. 709(a). No legislative discussion of sec. 709(a) has been cited or found. Granted that the history cited shows that the shipping industry is cyclical, the several provisions of the Merchant Marine Act show plainly that Congress gave effect to the cyclical factor in providing for the recapture of subsidy payments, in sec. 606(5), but did not give effect to it in

11. E. g. years in which such events as the Suez incident would increase the rental value of ships.

providing for additional charter hire, in sec. 709(a).

The remarkable series of cases reported sub nom. American Foreign Steamship Corp. v. United States, 2 Cir., 265 F.2d 139 and 144, rev'd 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491, opinions on remand 291 F.2d 598, dealt with a number of charters, some of which contained a clause, the first paragraph of which was like Clause 6 of the charter in the case at bar, but contained additional paragraphs which made the issues in those cases quite different from the issue presented here. See particularly 291 F.2d at 614. The reason for those additional paragraphs in the charters involved in the Second Circuit cases was explained by Judge Hincks, 265 F.2d at 140, 141. Almost all of the discussion in the various opinions of the Judges of the Second Circuit and all of the discussion in the opinions of the Justices of the Supreme Court dealt with other questions than the problem presented by our case. The Supreme Court intimated no view as to the merits of the underlying litigation. 363 U.S. at 691, 80 S.Ct. 1336, 4 L.Ed.2d 1491. However, in two opinions filed by Judge Clark, in which Judge Waterman concurred, 265 F.2d at 148, 149, 150, 151, and 291 F.2d at 610, 611, Judge Clark discussed the paragraph which is similar to Clause 6(a) of the Charter in the case at bar. He said:

"Turning now to Clause 13 itself —quoted in full in the opinion—it should be noticed that it is not a provision for claim adjustment; nor does it in any way suggest that it

was meant to deal with the processing of claims for refund. Clearly it is what it is labeled as being, namely, a provision for 'Additional Charter Hire.' It follows naturally after Clause 12, covering 'Basic Charter Hire,' and in its main section provides a scale for such additional hire based on cumulative net voyage profits of the charter in any *calendar year*. The emphasis on yearly accountings is obvious." (Emphasis in original).[12] See also American Export Lines, Inc. v. United States, Ct.Cl., 290 F.2d 925.

Both sides have cited cases dealing with various types of agreements calling for percentage rentals or using the terms "profits", "net profits", "net income profits" or "cumulative net profits", or various types of statutes using those terms.[13] Those cases are not particularly helpful in the case at bar, where the term "cumulative net *voyage* profits" must be read in the light of the entire statute and charter.

Respondents rely on an opinion by an Assistant General Counsel of Maritime, rendered in 1941 and since followed by Maritime, which construed sec. 709(a) to permit *losses* from an earlier year of a charter term to be carried forward to a later profit year, so that no additional charter hire would be payable at the end of the later year unless there were a cumulative net voyage profit from all years up to that time. However, Maritime has always maintained that the proviso at the end of sec. 709(a) prohibits the carrying forward of cumulative net voyage *profits*

12. The majority opinions did not hold the contrary. The most recent decision remands some of the cases to the District Court "to determine whether or not and to what amount valid claims exist on behalf of the libelants against the United States under the charters in suit." 291 F.2d at 609, 610.

13. Cited by the government: Rushlight v. United States, 9 Cir., 259 F.2d 658; Gluck v. Commercial Merchants Nat. Bank & Trust Co., S.D.Ill., 85 F.Supp. 287, aff'd 181 F.2d 773; Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.

Ct. 150, 75 L.Ed. 383; Hamden Holding Corp. v. United Men's Shops, Inc., 127 Conn. 500, 18 A.2d 356; Carlson v. D. A. Schulte, Inc., 124 Misc. 880, 209 N.Y.S. 631; Grosse v. Barman, 9 Cal. App. 650, 100 P. 348.

Cited by the respondents: Laystrom v. Continental Copper & Steel Industries, N.D.Ill., 133 F.Supp. 130; Beneficial Corp. v. Reading and Southwestern St. Ry. Co., E.D.Pa., 91 F.Supp. 803, aff'd 185 F.2d 238; Towles v. South Carolina Produce Ass'n, 187 S.C. 290, 197 S.E. 305.

from an earlier year into later profit *or* loss years, either (a) to pyramid the profits on which additional charter hire would have to be paid, *or* (b) to be offset by later losses, so as to require a refund (or cancellation) of the additional charter hire paid (or payable) on account of the cumulative net voyage profit of the earlier year.

The Department of Justice disagrees with Maritime to the extent that Maritime would permit *losses* to be carried forward. Justice agrees with Maritime that *profits* may *not* be carried forward, which is the important issue in the case at bar.

Respondents are forced to concede that Maritime's construction would not relieve Moore-McCormack from liability for the additional charter hire claimed by the government in this case, since there were no *earlier* loss years in the operations under the charter with which we are concerned. An argument based on contemporary administrative construction would not avail respondents in this case, since the administrative construction has been to carry forward losses into later profit years, not to carry back losses of later years to offset earlier profits. The contemporaneous administrative construction on the point at issue in the case at bar has been uniformly against the position taken by respondents.

Respondents argue that it is illogical and unfair for Maritime to allow the carry-forward of earlier losses into later profit years, and not to allow the carry-back of later losses into earlier profit years. From this respondents reason that the statute should be construed to allow losses to be both carried forward and carried back. The government quite properly replies that even if the construction adopted by Maritime is correct, Congress had the right to frame the statute as it saw fit, and that the courts cannot change the meaning of the statute even if they should happen to think that some other statute would be more logical, generous or wise.

It seems quite clear to me that the statute requires the computation of additional charter hire in this case on the basis of the cumulative net voyage profits of each year separately, without a second cumulation or averaging over the life of the charter.

Therefore, the statute must control, irrespective of the provisions of the charter or the conduct of the parties. However, if material, the construction adopted by the court is supported by the terms of the charter and the contemporaneous construction of the statute by the parties.

#### B.

The government also contends that respondents are estopped to deny the validity of the government's claim for additional charter hire because of the following acts and failures to act on the part of Moore-McCormack:

In 1941, Moore-McCormack filed a legal memorandum with Maritime in which it argued that sec. 709(a) required separate calendar year cumulation and payment of additional hire "without abatement for past or future losses." [14] In connection with several previous charters Maritime had refused to permit profits to be carried forward and offset by later losses. Moore-McCormack had objected, but because of the relatively small amount involved did not press its claims. In each of its annual accountings to Maritime under Charter MA–153, Moore-McCormack calculated the additional charter hire on the basis of strict calendar year cumulation without any attempt to carry back losses sustained in subsequent calendar years and offset them against the cumulative net voyage profits of earlier calendar years. In calculating the subsidy to which it was entitled under its subsidy agreements, Moore-McCormack always deducted as a subsidy expense its liabil-

---

14. That interpretation of the chartering provisions was advanced by Moore-McCormack in an attempt to obtain further allowances under the subsidy provisions of the Act, sec. 601 et seq., 46 U.S.C.A. § 1171 et seq.

ity for additional charter hire for the years 1951 and 1952, based upon separate annual calculations of cumulative net voyage profits. It is true that such accountings were in the form prescribed by Maritime (G.O. 74), but Moore-McCormack did not claim that such deductions, on the basis of calendar year cumulation, were tentative only, or contingent upon its raising at some indefinite future date the argument it now advances for "averaging" profits and losses over the whole life of the contract. When Moore-McCormack realized that it had sustained a loss for the calendar year 1953 under Charter No. MA–153, it did not argue "averaging". Instead, it applied for and obtained the right to make fewer sailings with the chartered vessels than were required in the original charter. Moreover, it requested and obtained several extensions of the chartering period.

Clause 39 of Moore-McCormack's Charter No. MA–153 specifically provided that the charter could be terminated after one year's operation, by either Maritime or the charterer giving ninety days' written notice to the other party, although the charterer's right to terminate may have been qualified by the subsidy agreement. The government argues that it might have terminated the charter or refused to renew it if Moore-McCormack had not apparently acquiesced in Maritime's position that under sec. 709 (a) the cumulative net voyage profit of an earlier year cannot be offset by future losses.

It is very doubtful whether respondents *can* be estopped from contesting the government's claim for additional charter hire, in view of such cases as

Sword Line v. United States, 2 Cir., 228 F.2d 344 and 230 F.2d 75.[15] And it is unlikely that the government would have terminated the operation of the Good Neighbor Fleet simply because Moore-McCormack indicated an intention to raise the pending question.

However, in view of this court's construction of the statute and charter as requiring that in this case the annual charter hire be computed and paid separately for each calendar year, and prohibiting any further cumulation or averaging, it is not necessary to decide the estoppel issue.

Counsel will prepare an appropriate order for a judgment in favor of the government, giving effect to this opinion.[16]

## Supplemental Opinion after Argument on the Question of Interest.

■ Sec. 6(a) of the charter required payment of additional charter hire "within thirty (30) days after the end of such year * * *". However, the government made no effort to enforce this provision for a number of reasons— including the fact that it was impossible to calculate the exact amount due until Moore-McCormack had ascertained and reported many items which could not be determined until more than thirty days after the end of the year.

Moore-McCormack first accounted to Maritime for its profits from 1951 charter operations on August 27, 1953, and for its profits from 1952 charter operations on November 27, 1953. Thereafter it submitted a number of supplementary accountings, six for 1951 and five for 1952. The final accounting for 1951,

15. Affirmed as to admiralty jurisdiction, 351 U.S. 976, 76 S.Ct. 1047, 100 L.Ed. 1493. See also American Export Lines, Inc. v. United States, Ct.Cl., 290 F.2d 925, at 931–32; Dichman, Wright & Pugh, Inc. v. United States, S.D.N.Y., 144 F. Supp. 922, 925; but see St. Louis, B. & M. Ry. v. United States, 268 U.S. 169, 174, 45 S.Ct. 472, 69 L.Ed. 899; Callanan Road Improvement Co. v. United States, 345 U.S. 507, 513, 73 S.Ct. 803, 97 L.Ed. 1206; Dollar S.S. Line v. United States, 9 Cir., 75 F.2d 444.

16. So that there may be no misunderstanding, at the request of counsel, I have inserted the words "in this case" in the next to last paragraph of section A of the foregoing opinion and in the next to last paragraph of the opinion itself, in order to make clear that I intimate no opinion one way or the other on the issue whether losses may be carried forward into subsequent profit years.

filed on October 9, 1958, was promptly audited by Maritime, which billed Moore-McCormack on November 28, 1958, for the additional charter hire shown thereby. The final accounting for 1952 was filed on November 25, 1958, and Maritime billed Moore-McCormack on January 14, 1959.

The several accountings filed by Moore-McCormack for each year included the items upon which (1) its claim for subsidy and (2) its obligation for additional charter hire were based. The claim and the obligation were interdependent, and both varied from time to time as additional items were brought into the successive accountings. Payments on account of subsidy were made by Maritime from time to time, but counsel for the government concedes that it is not possible to tell from the evidence in this case just when the interplay of the accountings and the payments first showed a net profit to Moore-McCormack for either of the years in question upon which some additional charter hire would have been payable. The final subsidy payment was only 10%, so the date in question must have been well before the final accounting, and therefore is a factor which should be taken into account in determining the proper rate of interest to be allowed for the period during which interest is clearly payable.

That period begins either with the date of the final accounting for each year—October 9, 1958, for the year 1951, and November 25, 1958, for the year 1952—or with the date on which the amounts shown to be due for additional charter hire were actually billed by the government—November 28, 1958, for the year 1951, and January 14, 1959, for the year 1952.

All factors considered, including the efforts which were made to obtain a decision on the principal question at issue in the case, I conclude that interest at the rate of 5% per annum should be allowed on $278,069.30 from November 28, 1958, to the date of judgment (for the year 1951), and on $314,019.14 from January 14, 1959 (for the year 1952). Of course, interest on the judgment will run at the rate of 6% per annum from the date thereof.[1]

---

1. I do not intimate that interest might not properly be charged for some period before the final accounting on the amounts of charter hire shown to be due by the earlier accountings for a particular year, if the evidence showed those calculations and the payments made by the government on account of subsidy more clearly than they are shown on the present record.